TUG VALLEY RECOVERY CENTER, INC.

*v.*

MINGO COUNTY COMMISSION, *etc., et al.*

(No. 14455)

LINCOLN CITIZENS FOR TAX REFORM, *et al.*

*v.*

LOUIS ABRAHAM, *et al., etc.*

(No. 14456)

Decided December 13, 1979.

*Kathleen Strasbaugh, Robert E. Wise, Jr.,* for Lincoln Citizens.

*Jane Moran, Robert E. Wise, Jr.,* for Tug Valley.

*Elliot E. Maynard,* Pros. Atty., for Mingo County Commission.

No appearance for Lincoln County Commission.

McGRAW, JUSTICE:

These two cases present essentially identical issues. Both regard the standing of concerned taxpayers to contest deficient property tax assessments in their home counties. In terms of the law applicable, the cases are functionally indistinguishable, and for that reason have been consolidated for decision.

The Tug Valley case involves an attempt by interested residents of Mingo County to have the assessment of certain mineral estates raised to a figure based upon the property's actual commercial value. The Tug Valley Recovery Center, petitioner below and appellant here, is a corporation registered with the State of West Virginia. Its main place of business is designated as Williamson, West Virginia, and it is itself a property owner and taxpayer in Mingo County. The respondents are elected members of the Mingo County Commission, and in this

capacity, sat as a Board of Equalization and Review during the month of February, 1978.[1]

On February 18, 1978, the petitioner, by representative and attorney, appeared before the Board for the purpose of presenting evidence that mineral interests in Mingo County were undervalued. The focus of petitioner's presentation was upon the holdings of the Cotiga Development Company. It appears from the record that Cotiga is one of Mingo County's larger mineral owners, holding approximately 39,000 acres in combination of fee, surface, and mineral ownership. The evidence presented indicates that the average assessed value of Cotiga's holdings was less than Eighteen Dollars ($18.00) per acre.

In support of petitioner's claims, the following evidence was submitted. First, a copy of a sale proposal by Cotiga to the State of West Virginia was introduced. This proposal was in the form of a letter to Governor John Rockefeller, and quoted a price not to exceed Four Thousand Five Hundred Dollars ($4,500.00) per acre. Additionally, petitioners presented a copy of the West Virginia Tax Commissioner's 1977 coal appraisal summary.[2] This report suggested a true market value of One Hun-

---

[1] W. Va. Code, § 11-3-24, provides that:

The county commission shall annually, not later than the first day of February, meet for the purpose of reviewing and equalizing the assessment made by the assessor.... The commission shall proceed to examine and review the property books.... If the commission determine that any property or interest is assessed at more or less than its true and actual value, it shall fix it at the true and actual value.... When it is desired to increase the entire valuation in any one district by a general increase, notice shall be given by publication.... After the county commission completes the review and equalization of the property books, a majority of the commission shall sign a statement that it is the completed assessment of the county for the year; then the property books shall be delivered to the assessor and the levies extended as provided by law.

[2] W. Va. Code, 18-9A-11, provides in part that:

... The tax commissioner shall make or cause to be made an appraisal in the several counties of the state of all nonutility real property ... which shall be based upon true and actual value.

dred Sixty Eight Dollars ($168.00) per acre for all coal interests in Mingo County. (Since the commencement of this action, the Tax Commissioner has revised the coal appraisal summary for Mingo County to suggest a true value of Three Hundred Sixty Dollars ($360.00) per acre.)

At this point, the record in the case becomes sparse. It appears that at the meeting of February 18, the Board of Equalization and Review received petitioner's presentation and indicated that the motion for reassessment of the county's mineral estates would be granted. Apparently, as a result of this meeting, notice was sent to the county's largest mineral owners that their assessments would be increased to the $168.00 per acre level prescribed by the State appraisal summary. Subsequently, the county commission seems to have reconsidered, and on February 28, 1978, it was decided that reassessment would be delayed until the following year, thereby leaving all coal assessments at their original level.

Thereupon, the petitioners appealed the order of the Board to the Circuit Court of Mingo County. The petition for appeal alleged that valuation of land rights belonging to Cotiga Development Company was below true and actual value. It asked that the circuit court correct the underassessment by setting an amount based upon actual commercial value.

Petitioners based their claim in circuit court upon injuries resulting from (1) discriminatory treatment as taxpayers (in that their property was more likely to be assessed at actual value than was Cotiga's), and (2) deprivation of governmental services (which assumably would flow from the additional tax revenue generated by any increased property assessment.)

After hearing arguments, the Mingo County Circuit Court granted a motion to dismiss the petition, expressly holding that the petitioner lacked standing to maintain the action. It is from this order, dismissing the appeal in circuit court, that the Tug Valley Recovery Center has appealed to this Court.

The facts in the Lincoln County case are similar, but in sufficient contrast to warrant brief treatment at this point.

In that case, the petitioner, Lincoln Citizens for Tax Reform, is not an incorporated body, but rather a voluntary association of approximately twenty-three Lincoln County residents, each named as a party. Of the members, twenty are resident property owners and taxpayers of Lincoln County, two are resident taxpayers, and one is a resident and parent of school-aged children. The appellees, as in the companion case, are elected members of the county commission (Lincoln County, in this case), sued in their capacity as members of the County Board of Equalization and Review.

The record indicates that the petitioners appeared before the Board on at least six occasions during the month of February, 1978. The purpose of these appearances was to present evidence showing a systematic, county-wide problem with undervaluation of mineral estates.[3] Petitioners requested that appellees raise the assessment of all mineral estates to true and actual value.

Following several meetings, the Board officially stated that Lincoln County mineral assessments were, indeed, assessed below actual value. The Board, however, refused to revalue the estates during the 1978 term, proceeding under the declared belief that there was "not enough time" to raise the assessments legally. This decision was appealed to the Circuit Court of Lincoln County.

In that proceeding, a final order was entered in July of 1978, finding the county's mineral assessments to be

---

[3] In the Lincoln County case, the evidence presented did not deal solely with the holdings of any one landowner, but rather with the holdings of all large landowners, generally. For instance, statistics cited revealed that the mineral land owned by Columbia Gas (owner of 78% of all minerals in the county) was assessed at $4.30 an acre. Armco Steel's holdings were assessed at $2.80 per acre. Perhaps most telling of all, the average assessed value of *all* mineral lands in the county was only $5.06 on the acre.

too low, and ordering the assessment to be increased for the *following* tax year. The order of the Lincoln County Circuit Court was based on a finding that "the legislature did not intend for [the court] to engage in the setting of tax amounts and that to do so for the tax year in question would deny due process to mineral holders whose taxes would be raised in this manner." The court specifically declined to rule on whether the petitioners had standing to pursue the appeal. It is from this order that the petitioner, Lincoln Citizens for Tax Reform, has appealed to this Court.

The cases present us with essentially two issues. First, does an interested resident or taxpayer have standing to contest the assessment of land not belonging to him? Secondly, to what extent does a circuit court have the power to set tax rates when the responsibility and duty to do so has been neglected by the Board of Equalization and Review?

I

In each of the two cases, the procedure followed by the petitioners was the same. The problem was first brought to the attention of the county commission sitting as a Board of Equalization. At that point in the procedure, the petitioners introduced evidence and made allegations that certain holdings within the county (that is, coal estates) were grossly undervalued, far below the true and actual value required by state law.

W. Va. Code § 11-3-1 explicitly requires that:

All property shall be assessed annually ... at its *true and actual value;* that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually sold. ...

Any assessor who knowingly fails, neglects or refuses to assess all the property of his county, as herein provided, shall be guilty of malfeasance in office.

This statutory provision is legislative vindication of the language of W. Va. Const. art. 10 § 1 that "taxation shall be equal and uniform throughout the state and all property, both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law."

In each case the county commission failed to act upon petitioner's request for the stated reason that they considered there to be too little time in which to act. Following this failure on the commission's part, petitioners appealed to their respective circuit courts.

It is the proceedings in the circuit courts that are being reviewed here. In each case, the petition in the circuit court was based specifically upon provisions found in W. Va. Code § 11-3-25 which reads in part, that

> Any person claiming to be aggrieved by any assessment in any land or personal property book of any county who shall have appeared and contested the valuation or whose asssessment has been raised by the county court above the assessment fixed by the assessor, or who contested the classification of taxability of his property may, at any time up to thirty days after the adjournment of the county court apply for relief to the circuit court of the county in which such books are made out....[4]

The question of who has standing to appeal an assessment under this statute boils down to definition of the term "any person...aggrieved." Analyzing the phrase, we must remain mindful that the language of a statute is not to be construed in any mystical fashion. In the absence of any specific indication to the contrary, words used in a statute will be given their common, ordinary and accepted meaning. *Burns v. Alcala*, 420 U.S. 575, 95 S. Ct. 1180, 43 L. Ed.2d 469 (1975); *State v. Cole*, ____ W.Va. ____, 238 S.E.2d 849 (1977); *Wooddell v. Dailey*, ____

---

[4] The "county court" contained in § 11-3-25 refers to the present institution of county commission. The change in title from "court" to "commission" is mandated by W. Va. Const. art. 9, § 9.

W.Va. ___, 230 S.E.2d 466 (1976); *Crockett v. Andrews*, 153 W.Va. 714, 172 S.E.2d 384 (1970); *Wilson v. Hix*, 136 W.Va. 59, 65 S.E.2d 717 (1951); *Miners v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941); *c.f., Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 98 S. Ct. 2370, 57 L. Ed.2d 239 (1978) (The starting point in every case involving construction of a statute is the language itself.); *Spradling v. Hutchinson*, ___ W.Va. ___, 253 S.E.2d 371 (1979) (A statute that is unambiguous requires no construction at all, and our duty is simply to apply it as written.)

This statute does not say that one may appeal an assessment of their own property, but that *any* person who is aggrieved by *any* assessment shall have the right to appeal that assessment (if they have appeared and contested the valuation before the Board of Equalization and Review).

Our initial impression is reinforced by the provisions of W. Va. Code § 18-9a-11, relating to the appraisal and assessment of real property for the support of the public school system. That section requires that the State Tax Commissioner make an appraisal of all non-utility real property in each county of the State, which appraisal is to be based upon true and actual value. It further provides that this appraisal is to be made available to each county commission and assessor and is to be used as the basis for determining the value of any parcel of land for assessment purposes. It is instructive that the statute specifically states that "in the event the county court shall fail or refuse to make the reallocation of levies as provided for herein, the county board of education, the tax commissioner, the state board, or any *other interested party*, shall have the right to enforce the same by a writ of mandamus in any court of competent jurisdiction."

This language makes it clear that "any interested party" is allowed to compel proper assessment of all real estate in his home county, thus evidencing a legislative intent to allow concerned taxpayers and residents to

insure that their own properties are not disproportionately taxed and to further insure that the county government is receiving all revenues that it is properly entitled to in order that all residents of the county will enjoy the maximum legal level of tax supported services and educational facilities.

This Court's opinion in the recent case of *Pauley v. Kelley*, ____ W.Va. ____, 255 S.E.2d 859 (1979), cogently sets forth the critical relationship between proper assessment practices and quality educational facilities for the people of the State. In that opinion, the need for a uniform measure of property assessment is stressed.

> [It] should be examined...whether the 'poor' counties are assessing their properties adequately, and whether, per W. Va. Code, 18-9A-11, the State Tax Commissioner reappraises all real property in the counties and to make certain that local assessors are using the Tax Commissioner's values ...
>
> It is obvious that W.Va. Code, 18-9A-11, reflects legislative perception that equality in property taxes could not occur until uniform property appraisements were set in the various counties. The legislature's intent to have this section complied with is demonstrated by these broad enforcement and penalty provisions ... 255 S.E.2d, at 880, 881.

The Court, speaking through Justice Harshbarger, then proceeds to list the various sanctions and enforcement mechanisms regarding property assessment, including the right of "any other interested party" to seek enforcement by writ of mandamus.

When two statutes relate to the same general subject and the two statutes are not in conflict, they are to be read *in pari materia*. *State ex rel. Miller v. Locke*, ____ W.Va. ____, 253 S.E.2d 540 (1979); *Snodgrass v. Sisson's Mobile Home Sales, Inc.*, ____ W.Va. ____, 244 S.E.2d 321 (1978). We, therefore, hold that insofar as W.Va. Code §§ 18-9A-11 and 11-3-25 both relate to the standing of tax-

payers and residents to insure full and proper assessment of all the county's land, they are to be read together. In this particular instance, the relationship between the two sections has been explicitly recognized. W.Va. Code § 18-9A-11 specifies that "[the] provisions of this section shall not be construed to alter or repeal in any manner the provisions of chapter 11 of this Code, but shall be construed *in pari materia* therewith, and compliance with this section by the assessor and county [commission] shall be considered, *pro tanto,* as compliance with said chapter 11."

It follows that since any interested party may compel compliance with the report of the State Tax Commissioner through a writ of mandamus as provided in § 18-9A-11, persons likewise have standing to contest the assessment of property in their home counties by way of statutory appeal after having appeared before the Board of Equalization and Review. W.Va. Code § 11-3-25.

The Circuit Court of Lincoln County was, therefore, in error in holding that that court is not empowered to set the assessment of land and that to do so would deny due process of law. It is clearly contemplated in the statutes that the circuit court is the proper forum in which to adjust erroneous and illegal assessments perpetrated by the county assessor or the Board of Equalization and Review. W. Va. Code § 11-3-25 is explicit on this point.

> ... If, upon the hearing of such appeal, [that appeal being the statutory appeal provided for in 11-3-25], it is determined that any property has been valued at more than its true and actual value, *or illegally classified or assessed,* the circuit court shall, by an order entered of record, collect the assessment, and fix the property at its true and actual value ... If it be ascertained that any property has been valued too high, and that the owner has paid the excess tax, it shall be refunded to him, and if not paid he shall be relieved from the payment thereof. *If it is ascertained that any property is valued too low the circuit court shall, by an order entered of record,*

> *correct the valuation and fix it at its true and
> actual value....* (emphasis added).

The Legislature is seldom more precise regarding their intent. For the Circuit Court of Lincoln County to hold "that the Legislature did not intend for [the circuit court] to engage in the setting of tax amounts" is erroneous. The Constitution of this State is clear in its mandate that the courts shall be open to all people in this State. W. Va. Const. art. 3, § 14. It does very little good to have open courts if those courts refuse to give remedies under the pretense that they are not a proper forum.

Implicit in our holding today, and in the Acts of the Legislature, is the understanding that every taxpayer, every person affected by the tax base, has a financial interest in seeing that all property in the district be properly taxed. The recognition of this interest is by no means a new or radical concept. Over thirty years ago, in the landmark case of *Board of County Commissioners v. Buch,* 190 Md. 394, 58 A.2d 672 (1948), the Maryland court faced the task of interpreting the terms of a statute strikingly similar to our own. The statute there involved read in part:

> Any taxpayer, or city, or the Attorney General on behalf of the State, may demand a hearing before the County Commissioners or the assessing authorities of any other city as to the assessment of any property or any unit of tax value, or as to the increase or reduction or abatement of any such assessment, or as to the classification thereof, for the next ensuing year.

The *Buch* court had little difficulty in interpreting this statute to allow third-party taxpayer suits. In the court's words:

> Upon its face, the language of Section 190 that "any taxpayer * * * may demand a hearing before the County Commissioners * * * as to the assessment of any property or any unit of tax value, or as to the increase or reduction or abate-

ment of any such assessment," would appear to be clear and unambiguous, and so sweeping as to forbid its limitation, by construction, to the assessment of property owned by the particular taxpayer demanding the hearing. It may also be observed that the express authorization of a hearing in the event of a reduction or abatement of assessment would seldom be availed of by a taxpayer so fortunate to obtain that particular relief.

The court went on to counter the inevitable logistical argument of practicality: that such an interpretation would open the doors to vexatious and frivolous demands, and interfere with the orderly reassessment of property under standard operating procedures. There was little, if any, patience displayed for such a frivolous line of argument. "In any event, the argument ab inconvenienti has little weight as against the allegations of underevaluation and inequality, directly affecting the pecuniary interest of the petitioner."

The rationale behind this line of thought is difficult to refute. It simply recognizes that the interests of all members of the community are affected by the system of tax assessment. If one party is underassessed, the resulting injury is to all other members of the taxing district who are discriminatorily assessed and denied the benefits of full and equitable taxation. *Cumberland Coal Co. v. Board*, 248 U.S. 23, 52 S. Ct. 48, 76 L. Ed. 146 (1931); *Sioux City Bridge Co. v. Dakota Co.*, 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923); *Sunday Lake Iron Co. v. Wakefield*, 247 U.S. 350, 38 S. Ct. 495, 62 L. Ed. 1154 (1918); *Dundee Mortgage Trust v. Charlton*, 32 F. 192 (1887); *In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959); *Foote v. Town of Bradford*, 109 Ct. 358, 146 A. 723 (1929). *See generally*, Annot., 5 A.L.R.2d 569 (1949).

In the case of *Baltimore Steam Packet v. Baltimore*, 161 Md. 9, 155 A. 158 (1937), the appellant complained that it was taxed on certain property, while its competi-

tors were exempt under what was claimed to be an invalid statute. The court said:

> If this be true, its remedy lies, not in attempting to be relieved of the tax itself, but in restraining the proper taxing officials from allowing the exemption to its competitors. Every taxpayer has a financial interest in seeing that all property in the state, properly the subject of taxation, should be taxed, because, by increasing the taxable basis, the rate necessary for the production of the expenses of the state and the local governments will be reduced, and the individual's tax correspondingly lowered.

Viewed in this light, the concrete and unmistakable interest of the petitioners here becomes crystal clear. We are not dealing with an abstraction, but with the promise of tangible benefit to each and every member of the community. On the one hand, by increasing the taxable basis, the rate necessary for the operation of government will be reduced and the individual's tax correspondingly lowered. Yet, even if the petitioners' personal tax assessments were to remain unchanged, the benefit to be derived is obvious. An increase in the total tax base will yield higher revenues, thus improving the quality and quantity of services for all county residents. This constitutes the "direct and substantial interest" required to give a party standing in a controversy. *Shobe v. Latimer*, ____ W.Va. ____, 253 S.E.2d 54 (1979).

While some of the earlier cases suggest that the proper remedy in this sort of case is a reduction of petitioner's assessment, as opposed to an increase in the assessment of a deficient third party, we decline to accept such reasoning in light of the clear statutory mandate requiring full taxation, W. Va. Code § 11-3-1; W. Va. Code, § 18-9A-11, and in light of the interest of all citizens in full and equitable taxation. Indeed, it seems clear that the sort of remedy pursued herein by petitioners is the only appropriate remedy available. So long as petitioners' own properties are properly valued, there can be no claim that they are entitled to assessment reductions.

Such a result would clearly be contrary to the dictates of our State law. W. Va. Code, § 11-3-1. Therefore, the only legally proper remedy for this discriminatory situation is to compel compliance with the law in regard to the deficient assessment of the affected third parties.

A comparable situation was confronted by the United States Supreme Court in the case of *Liggett v. Lee*, 288 U.S. 517, 53 S. Ct. 481, 77 L. Ed. 929 (1933). In the words of Mr. Justice Roberts:

> Under the law of Florida, every unit of the taxpaying public has an interest in having all property subject to taxation legally assessed, and may in behalf of himself and others in like situation require that all property subject to taxation be placed on the tax books and bear its proportionate part of the expense of government. The appellants, if they deem the tax illegally omitted in certain cases, may apply for a writ of mandamus to compel the taxing officials to do their duty. *State ex rel. Dofnos Corp. v. Lehman et al.*, 100 Fla. 1401, 131 So. 333. Failure to collect the tax from some whose occupations fall within the provisions of the act cannot excuse the appellants from paying what they owe. And certainly the remedy afforded by state law assures them equal treatment along with all others similarly situated.
>
> *Compare, Southern Railway Company v. Clement*, 57 Tenn 54, 415 S.W.2d 146 (1967), *cert. denied* by Supreme Court May 15, 1967; *McNayr v. State ex rel. Dupont Plaza Center, Inc.*, 166 So.2d 142 (Fla. 1964); *State v. Board of Tax Appeals*, 175 Ohio St. 448, 195 N.E.2d 908 (1964); *Village of Ridgefield Park v. Bergen County Board of Taxation*, 31 N.J. 420, 157 A.2d 829 (1960); *State v. Glander*, 160 Ohio St. 59, 113 N.E.2d 357 (1953); *Pierce v. Green*, 229 Ia. 22, 294 N.W. 237 (1940). *See also, Switz v. Middletown Township*, 23 N.J. 580, 130 A.2d 15 (1957) (dealing with the problems which result from failure of tax officials to properly assess land, and the attendant difficulties of

compelling proper assessment through taxpayer suits.)

## II

This Court recognizes the problems inherent in setting the proper amount of tax to be paid on any given parcel of land. The assessment of real estate values is a very technical and complex area, particularly insofar as we are dealing with the assessment of mineral estates, those estates being invisible to the eye and being difficult to properly and scientifically assess. The difficulty, however, does not justify a court in refusing to perform that task when an interested citizen has been denied relief within the appropriate administrative forums.

The task is lightened to a great extent by the provisions of W. Va. Code § 18-9A-11. As mentioned previously, that section of the Code specifically provides that the State Tax Commissioner is to make an appraisal of all mineral and surface estates in West Virginia, and *that appraisal is to serve as the basis for determining true and actual value for all assessment purposes.* Therefore, once the Tax Commissioner's appraisal has been made, the duty of the circuit court is clear and the taking of further evidence would not be necessary. It is incumbent upon the circuit court, as it would be upon the county commission and the assessor, to set the assessed value of all parcels of land at the amount established by the State Tax Commissioner.

In the Mingo County case, in which a State Tax Commissioner's appraisal was introduced, there was no reason for the court to shun its responsibility to set the assessment of Cotiga's property at the prescribed $168.00 per acre. (At this point the value should be at $360.00 per acre as the State Commissioner's appraisal has been revised to stay in line with current market values.)

There is more difficulty with the Lincoln County case. In that case the appraisal of mineral estates in Lincoln County had not yet been completed by the State Tax

Commissioner, so there was no State appraisal summary. (For this reason petitioners relied to a great extent upon the Commissioner's appraisal of mineral estates in Boone County, it apparently being concluded by all involved that "an acre of coal in Lincoln County was worth at least as much as an acre of coal in Boone County.") Though the issue may be moot in the instant case, it now being true that Lincoln County has been assessed by the State Commissioner, it must be noted that the provisions of W. Va. Code § 11-3-25 are not dependent upon the existence of a state appraisal. The statute states flatly that an aggrieved party may contest the valuation and appeal to the circuit court to have the assessment raised to true and actual value as required by W. Va. Code § 11-3-1. The fact that an appraisal summary had not been completed did not justify the circuit court in refusing the appeal and waiting on the summary from the State Tax Commissioner.[5] There should have been some attempt to set the appraisals at true and actual values.[6]

---

[5] It is interesting to note that W. Va. Code § 18-9A-11 specifically states that the State Tax Commissioner's appraisal of the property in the several counties was to be completed prior to the first day of July, one thousand nine hundred sixty-seven. It strikes this Court as incredible that in a suit filed in Lincoln County in 1978, the State Tax Commissioner had, as of that time, failed to issue an assessment report on Lincoln County coal estates—some 11 years after the statute mandated the completion of this report.

[6] A point must be made regarding the taking of evidence in circuit court. While the procedure followed in each of these cases is referred to as a "statutory *appeal*," the term is inappropriate. As set forth in Code, 11-3-25, if there was no appearance before the county commission by the *owner* of the land involved, and if the owner never had actual notice of the proceedings, then the matter is to be heard *de novo* in the circuit court.

Thus, in the Mingo County case, where notice was given to the landowners involved, the proceeding in circuit court would only be an appellate review of the record (including the state appraisal). However, in the Lincoln County case, no appearance was made by any of the involved landowners, and no one was ever given notice. Therefore, when the case got to circuit court, the proceeding was a trial *de novo*, and the court was free to consider any relevant evidence, whether contained in the original record or not.

In brief summation, pursuant to W. Va. Code § 18-9A-11, that section is to read *in pari materia* with § 11-3-25 and all other sections of Chapter 11 dealing with assessment of land in the various counties. An interested taxpayer or recipient of tax-supported services has the

---

It must be emphasized, also, that a critical aspect of the entire procedure is the requirement of notice to the affected owner of the property. *See, e.g., Pulaski County v. Commercial National Bank,* 210 Ark. 124, 194 S.W.2d 883.

The notice requirement is spelled out in W. Va. Code, § 11-3-24, which provides that:

[No] assessment shall be increased without giving the property owner at least five days notice, in writing, and signed by the president of the [county commission], of the intention to make the increase. Service upon the property owner shall be sufficient, or upon his agent or attorney in person, or if sent by registered mail to such property owner, his agent, or attorney, at the last known place of abode. If he be not found and have no place of abode, then notice shall be given by publication thereof as a Class I legal advertisement in compliance with the provisions of article three [§ 59-3-1 et seq.], chapter fifty nine of this Code, and the publication area for such publication shall be the county. The date of the publication shall be at least five days prior to the increase.

Under this provision, the Board of Equalization and Review may not increase any assessment until the proper notification has been given. This insures due process of law for the affected owner. This Court has commented on this notice provision in *Consolidation Coal Co. v. Krupica,* _____ W.Va. _____, 254 S.E.2d 813 (1979) in which it observed that: "where the county commission increases the assessment, the property owner must be given at least five days' notice in writing of the intention to make the increase."

The rights of the owner are further safeguarded in circuit court under the procedure specified in Code, 11-3-25. In appeals of the sort involved in this case, the affected property owner is *entitled* to a trial *de novo* in circuit court unless he appeared before the Board of Equalization and Review, or had *actual notice* of the proceedings and failed to appear.

Thus, the rights of the affected owner are protected at each step. Before the Board, no action can be taken without notice to the owner under Code, 11-3-24. In the event of appeal by the contesting party, the owner is given a second opportunity with the requirement of separate notice of these proceedings. If the affected owner did not receive actual notice of the proceedings before the Board, his right to present evidence is protected by a *de novo* proceeding in circuit court. W.Va. Code, § 11-3-25.

right under the two statutes to contest the valuation of any parcel of land in his or her county, and to appeal an adverse ruling to the circuit court of that county pursuant to § 11-3-25. Alternatively, under § 18-9A-11, any interested party also has the right to enforce compliance with the State Tax Commissioner's appraisal by writ of mandamus.

Reading the statutes *in pari materia*, in the Mingo County case petitioners had a right to have assessments raised to the level prescribed by the State Tax Commissioner. In the Lincoln County Case, a State Tax Commissioner's appraisal not yet being available, petitioners had a right to introduce evidence of true and actual market values, (see footnote 6), and their appeal should have been heard by the circuit court, whose duty it is to correct improper assessments and set the assessment of the affected lands at true market value.

As a collateral issue, it is complained by respondents in each case that there is not a proper record upon which the court may act. This contention is without merit. Petitioner in each case made a point of filing with the circuit court copies of all papers existing in regard to their proceedings before the Board of Equalization and Review. We are not inclined to disallow an appeal based upon the fact that the county commissions in each case refused to enter any formal order on the record. So long as all documents utilized by the Board of Equalization and Review were placed before the circuit courts and so long as all other documents pertaining to the appeal were in the file, the Court had a record on which to act.

It is a matter of common sense that the proceedings of county commissions, for obvious reasons, are to be construed with less strictness than courts of formal record. *Davis v. Baker*, 109 W.Va. 192, 153 S.E. 491 (1930); *Trammel v. Stafford*, 75 W.Va. 98, 83 S.E. 299 (1914). So long as all papers filed in the proceeding before the commission are included and properly identified, the court will have a proper record upon which to act. *In re Stonestreet*, 147

W.Va. 719, 131 S.E.2d 52 (1968); *Jones v. Jones*, 135 W.Va. 554, 64 S.E.2d 24 (1951).

In accord with the reasoning herein, the orders of the Circuit Courts of Mingo County and Lincoln County are reversed and the cases remanded with instruction that the appeals be granted and that the proper value of the affected parcels of land be set by the circuit court based upon taking of relevant evidence.

*(Mingo County)*
*Reversed.*
*(Lincoln County)*
*Reversed.*