427 S.E.2d 238

**In re ELK SEWELL COAL, et al.**

**No. 21462.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 1993.

Decided Feb. 11, 1993.

**4**

Herschel H. Rose, III, O. Gay Elmore, Jr., Rose & Associates, Charleston, for Webster County Bd. of Educ.

Ernest V. Morton, Jr., Pros. Atty., Webster Springs, for Webster County Com'n.

Timothy Ruckman, Dan O. Callaghan, Callaghan & Ruckman, Summersville, for Island Creek Coal Co. and Western Pocahontas Properties.

BROTHERTON, Justice:

In this case we are asked to answer three certified questions which address the legality of permitting taxpayers to pay disputed property taxes into an escrow account pending appeals of their assessments.

On January 18, 1989, the United States Supreme Court reversed this Court and declared that certain property assessments made in Webster County, West Virginia, violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. *Allegheny Pittsburgh Coal Co. v. County Commission of Webster County, West Virginia, and East Kentucky Energy Corp. v. County Commission of Webster County, West Virginia,* 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). Following this decision, under an order from the Circuit Court of Webster County, the Webster County Assessor established uniform assessments of certain types of county properties. In February, 1990, a number of these assessments were protested before the Webster County Commission, sitting as a Board of Equalization and Review.

In March, 1990, some taxpayers appealed the subsequent adverse rulings made by the Webster County Commission/Board of Equalization and Review. These appeals were finally disposed of by various circuit court rulings and orders entered in June, July, and August, 1992. However, while the appeals were pending, the circuit court permitted certain taxpayers to deposit either all or part of the property taxes arising from the disputed assessments into an escrow account kept by the Sheriff of Webster County.

For example, on July 31, 1990, upon agreed order submitted by the Prosecuting Attorney of Webster County and the taxpayers' counsel, the circuit court granted leave so that the taxpayer in *In re: Tax Assessment Against Western Pocahontas Properties 1990 Taxes,* Civil Action No. 90–MSC–16 (Circuit Court of Webster County),

could pay its 1990 property taxes by remitting a sum equal to their 1989 tax liability and placing in an escrow account with the sheriff a sum equal to the difference between the taxpayer's 1990 and 1989 tax liability. This method of settlement was made available to any other like petitioners.

In another instance,[1] on August 28, 1990, the circuit court, again by agreed order, granted the taxpayer leave "to pay on its 1990 tax assessment in an amount equivalent to the tax levied against its properties for the year 1989...." No payment into escrow was required. The court simply noted that "[i]n the event the petitioner prevails in this action, the question of the method of paying any additional taxes shall be moot." This arrangement was also offered to any similarly situated protesting taxpayers.

The Webster County Board of Education (hereinafter referred to as the BOE) contends that all taxpayers who appealed their 1990 Webster County property taxes were relieved from the burden of having to completely pay all 1990 property taxes, either by the direct application of an order similar to those described above, or by the general application of the relief embodied in those orders to all taxpayers.

According to the BOE, the effect of those circuit court orders on the BOE's financial well-being has been "dramatic." The BOE maintains that the 1990 property taxes became delinquent and uncollected in May, 1991, and that the real property subject to these taxes should have been sold by the Sheriff between October 15, 1991, and November 22, 1991. However, because taxpayers were granted leave to refrain from full payment of 1990 property taxes, no Sheriff's sale occurred. The BOE states that its anticipated 1990 property tax receipts were $1,570,823.00, but as of May 1, 1992, only $905,146.25 of the anticipated revenues had been received.

The BOE states that "[a]ppealing taxpayers have failed to pay $474,819.71 due the Board of Education for 1990 taxes and have an additional $112,115.85 escrowed with the Sheriff of Webster County, making a total of $586,935.56 unavailable to meet the current expenses of the Board of Education. For all contested 1990 property taxes, only $198,229.34 of a total due of $785,164.90, or 25.2% of 1990 property taxes due for the respondent taxpayers, has been distributed to the Board of Education, more than one year after the 1990 taxes fell delinquent."

Apparently, a similar situation exists in tax year 1991. The BOE states that the circuit court again entered agreed orders similar to those entered regarding the 1990 taxes, excusing taxpayers from payment of all or part of any tax increase experienced relative to their 1989 property taxes. Although BOE revenues were expected to total $1,729,646.00 in 1991, the BOE states that as of May 1, 1992, only $876,037.70, or about 50%, had been received. The BOE states that the reduction in property tax receipts which resulted from the circuit court orders "has materially reduced the total combined state and local support for schools in Webster County."

On August 21, 1992, the Circuit Court of Webster County entered orders which denied the appeals of a majority of the taxpayers. As a result, all matters concerning the propriety of property assessments for tax years 1990, 1991, and 1992 have now been decided below. By other rulings made on August 21, 1992, which were not reduced to written orders, the circuit court permitted several taxpayers to pay the first half of their 1992 taxes into escrow, and stated that the portion of the escrowed monies due and owing to the BOE would be released from escrow on September 21, 1992, provided that this petition appealing the circuit court rulings was filed with the circuit court clerk by September 10, 1992. A prior BOE motion to release the escrowed monies was overruled on July 17, 1992. However, the circuit court also ruled on that date that the following questions should be certified to this Court:

---

1. *Elk Sewell Coal Company v. The County Commission of Webster County, West Virginia, the Honorable Dana Lynch, Assessor Webster Coun-* ty, Civil Action No. 90–MSC–13 (Circuit Court of Webster County).

I.  Does a County Board of Education have standing to intervene in the appeal of a property assessment pending in the Circuit Court if it did not separately appear before the Board of Equalization and Review in the Appeal of the property assessment there?

Circuit Court's Answer:  No.

II.  May a Circuit Court, by an Order agreed to by the Prosecuting Attorney and the Appellant taxpayers but without the specific consent of the County Board of Education, allow payments of ad valorem taxes, due but disputed, to be placed in an escrow account maintained by the Sheriff pending the appeal of those taxes in the Circuit Court?

Circuit Court's Answer:  Yes.

III.  If the Answer to the above is "yes", should the escrowed monies be released from escrow to the Sheriff and the levying bodies upon final determination of the merits of the appeal by the Circuit Court or must the appeal first be decided by the West Virginia Supreme Court of Appeals?

Circuit Court's Answer:  The escrowed monies may be released from escrow to the Sheriff and the levying bodies upon final determination of the merits of the appeal by the Circuit Court.

The BOE now states that it "desperately needs and is entitled to the tax revenues currently held in escrow" and argues that the Circuit Court erred in its answers to Questions I and II.  For the reasons discussed below, we agree.

## I.

■  Does a County Board of Education have standing to intervene in the appeal of a property assessment pending in the Circuit Court if it did not separately appear before the Board of Equalization and Review in the Appeal of the property assessment there?

The issue of standing to appeal property assessments is discussed in W.Va.Code § 11–3–25 (1991), which provides that:

[A]ny person claiming to be aggrieved by any assessment in any land or personal property book of any county who shall have appeared and contested the valuation or whose assessment has been raised by the county court [county commission] above the assessment fixed by the assessor, or who contested the classification or taxability of his property may, at any time up to thirty days after the adjournment of the county court [county commission], apply for relief to the circuit court of the county in which such books are made out; but he shall, before any such application is heard, give ten days' notice to the prosecuting attorney of the county, whose duty it shall be to attend to the interest of the State, county and district in the matter, and the prosecuting attorney shall give at least five days' notice of such hearing to the tax commissioner....

The respondents contend that because the BOE failed to appear before the Board of Equalization and Review during the years 1990–92, the BOE has no standing to intervene in the appeals relating to the 1990–92 property tax assessments.  To support this argument, the respondents cite this Court's decision in *Tug Valley Recovery Center, Inc. v. Mingo County Commission, et al.*, 164 W.Va. 94, 261 S.E.2d 165 (1979), in which we concluded that "[a]n interested taxpayer or recipient of tax-supported services has the right ... to contest the valuation of any parcel of land in his or her county, and to appeal an adverse ruling to the Circuit Court of that county pursuant to § 11–3–25," provided that they have appeared before the Board of Equalization and Review.  *Id.*, 261 S.E.2d at 171, 174.

In this case, however, the BOE is not protesting a property tax assessment or appealing an adverse ruling.  Instead, the BOE seeks to intervene in this matter in order to question the propriety of the subsequent settlement arrangement by which the prosecuting attorney and the county commission agreed to permit the appealing taxpayers to deposit a portion of their disputed property taxes into an escrow account pending appeal.  For this reason, we disagree with the basis of the respondents'

argument. West Virginia Code § 11–3–25 does not require that a party which is neither protesting a property tax assessment nor appealing an adverse ruling must have first appeared before the Board of Equalization and Review in order to have standing to intervene and raise a separate issue which becomes relevant on appeal.

It is significant, therefore, that the escrow account issue which is at the center of this dispute did not arise before the Board of Equalization and Review. The agreed orders which provided for the arrangement were not submitted until the appeals of the assessments were before the circuit court. Consequently, it was not until after the Board of Equalization and Review had adjourned and the BOE was confronted with budgetary shortfalls that the BOE began to appreciate the magnitude of the problems created by the escrow arrangement. Thereafter, the BOE's position was simply that the initial assessments should be enforced by requiring full payment of property taxes owed pending appeal in order that the BOE could receive its projected revenues for the years in question.

Because this matter did not involve a BOE dispute over the actual property assessments, we can discern no reason which justifies denying the BOE the right to intervene simply because it did not appear before the Board of Equalization and Review. The BOE initially felt that it had no reason to appear before the Board.[2] However, the problems occasioned by the payment of disputed taxes into escrow, and the unavailability of those revenues to the BOE for such an extended period of time, have now necessitated their intervention in this dispute.

For this reason, we conclude that the fact that the BOE did not appear before the Board of Equalization and Review does not preclude its subsequent intervention in the appeal process because it was materially affected by the manner in which certain taxpayers were permitted to pay their property taxes pending appeal. Thus, the answer to the first certified question is "yes".

## II.

May a Circuit Court, by an Order agreed to by the Prosecuting Attorney and the Appellant taxpayers but without the specific consent of the County BOE, allow payments of ad valorem taxes, due but disputed, to be placed in an escrow account maintained by the Sheriff pending the appeal of those taxes in the Circuit Court?

■ This Court addressed the issue raised by the second certified question in *State ex rel. Ayers v. Cline*, 176 W.Va. 123, 342 S.E.2d 89 (1985). In *Ayers*, a dispute arose because the Circuit Court of Webster County excused non-payment of property taxes pending appeal of a property tax dispute. In syllabus point 1 of *Ayers*, we stated that:

The statutory scheme for relief from an excessive property tax assessment is for an owner of real property contesting the assessed value thereof to pay the tax assessment under protest, to appeal to circuit court and if the assessment is reduced, to obtain a refund of the overpayment. *Payment may be withheld during an appeal in such a case only until the date of the sheriff's sale, or, at the very latest, until the end of the redemption period after such sale has occurred.* (Emphasis added.)

The respondents attempt to distinguish *Ayers* by arguing that the taxpayers herein appeared before the Board of Equalization and Review, and the escrow account was the result of a subsequent settlement agreement between the prosecuting attor-

**2.** The matter is further complicated by the fact that, as noted in W.Va.Code § 11–3–25, the prosecuting attorney owes a duty to represent the interests of the state, county, and district in matters involving property tax assessments. In this case, the prosecuting attorney did appear before the County Commission/Board of Equalization and Review, and the BOE argues that if we are to strictly interpret W.Va.Code § 11–3– 25, then technically, the BOE also made an appearance before the Board of Equalization and Review. However, conflict of interest charges have been made because the prosecuting attorney entered into the settlement agreement with the county commission and appealing taxpayers, and now opposes the BOE's expressed interests concerning release of the escrowed funds.

ney, the county commission, and the appealing taxpayers. Once again, the respondents simply argue that because the BOE itself did not appear before the Board of Equalization and Review, it has no standing to intervene and object to the escrow arrangement. For the same reasons we discussed in response to the first certified question, we disagree with the respondent's contention that the BOE lacks standing to intervene and raise this issue now.

■ The prosecuting attorney had absolutely no authority to attempt to settle this dispute, albeit temporarily, by entering into the agreed order with the county commission and the taxpayers which permitted the taxpayers to pay their disputed taxes into an escrow account or to withhold the payment of the disputed amount of taxes pending appeal. As we emphasized in *Ayers,* the statutory scheme found in the West Virginia Code requires a taxpayer who disputes his property tax assessment to pay the full amount of the assessment under protest, then appeal to the circuit court and obtain a refund if the assessment is reduced. 342 S.E.2d at 94. "Payment may be withheld during an appeal in such a case only until the date of the sheriff's sale, or, at the very latest, until the end of the redemption period after such sale has occurred. Otherwise, the public's 'paramount' need for 'regular [that is, current] tax income ... particularly for school purposes' ... would not be provided." *Id.*

There is no statutory mechanism in the West Virginia Code which authorizes parties to enter into a settlement agreement under which a taxpayer may withhold full payment of property taxes due pending appeal of an assessment. Thus, the answer to the second certified question is "no".

### III.

■ Finally, we wish to briefly address the payment issue which is raised by the third certified question. The public policy reasons for requiring prompt and timely payment of property taxes pending an appeal were set forth by the Legislature in

W.Va.Code § 11A–3–1 and noted by this Court in *Ayers:*

In view of the paramount necessity of providing regular tax income for the State, county and municipal governments, *particularly for school purposes;* and in view of the fact that tax delinquency, aside from being a burden on the taxpayers of the State, seriously impairs the rendering of these essential services; and in view of the further fact that delinquent land, with its attendant problems made acute by the events of the past decade, not only constitutes a public liability, but also represents a failure on the part of the delinquent private owners to bear a fair share of the costs of government; now, therefore, *the legislature declares that its purpose in the enactment of this and the following article is threefold: First, to provide for the speedy and expeditious enforcement of the tax claims of the State and its subdivision;* second, to provide for the transfer of delinquent lands to those more responsible to, or better able to bear, the duties of citizenship than were the former owners; and third, in furtherance of the policy favoring the security of land titles, to establish an efficient procedure that will quickly and finally dispose of all claims of the delinquent former owner and secure to the new owner the full benefit of his purchase. (Emphasis added.)

*Ayers,* 342 S.E.2d at 93. The BOE states that these concerns are particularly real in this case, because "[t]aken together, the refunds and the reduced current tax receipts threaten the Board of Education's ability to maintain the current level of educational opportunity in Webster County Schools."

In response to the third certified question, the circuit court stated that "[t]he escrowed monies may be released from escrow to the sheriff and levying bodies upon final determination of the merits of the appeal by the circuit court." The respondents argue that the monies should remain in escrow until after this Court rules on the certified questions, because if and when

the monies are dispersed, they will be spent.

However, the BOE maintains that the respondents' concerns are without basis. First, the BOE states that there has been no indication that the circuit court decision dismissing the taxpayer's assessment challenge will be appealed, and, even if it were, it appears unlikely that any such appeal would be successful. Second, there is a statutory scheme in place to account for situations in which tax refunds are ordered. West Virginia Code § 11–3–26 (1991) provides that:

> Whenever the circuit court, on appeal, shall grant relief to any such applicant against the taxes, or any part of them, assessed against him either on the land or the personal property books, an order shall be made by such court exonerating such applicant from the payment of so much of such taxes as are erroneously charged against him, if the same have not been paid; and if paid, that the sum so erroneously charged be refunded to him. Such order, delivered to the assessor, sheriff or other collecting officer shall restrain him from collecting so much as is erroneously charged, and, if the same has been already collected, shall compel him to refund the money, if such officer has not already paid it into the treasury, and in either case, when indorsed by the person exonerated, it shall be a sufficient voucher to entitle the officer to a credit for so much in his settlement, which he is required to make. If what was erroneously charged has been paid into the state treasury, the order of the circuit court, attested by its clerk, shall entitle the claimant to a warrant on the state treasury for the amount thereof, if application for the same be made to the auditor within one year after the date of such order.

**3.** West Virginia Code § 18–9A–12(b)(1) (1992) states that:
> In those instances where the local share as computed under section eleven of this article is not reflective of local funds available because the county is under a final court order to refund or credit property taxes paid in

Finally, in the event the assessments are overturned and the assessor, sheriff, or other collecting officer has insufficient funds to effectuate a refund, the BOE, as beneficiary of the funds, would be responsible to pay the refund amount. The BOE states that its credit worthiness was established in that it effected the refunds of the taxes mandated by the *Allegheny Pittsburgh* decision. Further, the Legislature amended W.Va.Code § 18–9A–12 so as to adjust the state aid formula in order to account for and compensate boards of education for refunded amounts.[3]

For the reasons discussed above, we conclude that the monies currently held in escrow are to be released immediately. Having answered the questions certified by the Circuit Court of Webster County, this case is ordered dismissed from the docket of this Court.

Certified Questions Answered.

prior years, the allocated state aid share shall be the county's basic foundation program, minus the local share as computed under section eleven of this article, plus the amount of property tax the county is unable to collect or must refund due to the final court order.