295 S.E.2d 689

**Ray KILLEN, as President, Logan County Board of Education, etc., et al.**

v.

**LOGAN COUNTY COMMISSION, etc., et al.**

No. CC931.

Supreme Court of Appeals of West Virginia.

July 2, 1982.

Dissenting Opinion July 15, 1982.

Concurring Opinion Sept. 3, 1982.

Miller, C. J., filed a concurring opinion.

Neely, J., filed a dissenting opinion.

W. Bernard Smith, Logan, for plaintiffs.

G. Thomas Battle and David B. Shapiro, Charleston, Edward I. Eiland, Logan, Er-

nest Hays, II, Bluefield, for Amherst Coal Co.

Jacquline A. Kinnaman, Charleston, for amicus curiae W.Va. Educ. Ass'n.

Alice Green, Charleston, for amicus curiae W.Va., for Fair and Equitable Assessment of Taxes.

Jane Moran, Williamson, for amicus curiae Tug Valley Recovery Center.

McGRAW, Justice:

This case comes to us upon a certified question from the Circuit Court of Logan County. The Logan County Board of Education and its president filed an action there seeking review of a decision by the Logan County Board of Equalization and Review which approved assessment values set by the Logan County assessor. The question certified to this Court is whether W.Va.Code § 18–9A–11 (1977 Replacement Vol.), which allows assessors to value property at 50–100 percent of its appraised value, violates the state constitution's guarantee of "equal and uniform taxation throughout the State ...." W.Va.Const. art. 10, § 1.[1] The trial court held that the statute was unconstitutional. We affirm that ruling.

The issue in this case is clear. W.Va. Code § 18–9A–11 purports to authorize county assessors to assess property at 50–100 percent of the appraised value determined by the state tax commissioner pursuant to the same statute. Article 10, section 1 of the West Virginia Constitution declares that "taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to its *value* to be ascertained as directed by law." (Emphasis added.) The respondents, the Logan County Board of Education and its president, argue that assessment of property at a fraction of its appraised value is unconstitutional because the 50–100 percent provision results in unequal and non-uniform assessment, and thus unequal and non-uniform taxation. The petitioners, individual property owners who intervened in the case below, contend that the 50–100 percent provision represents a legislative recognition that differences of opinion exist as to the value of property. In their view, the statute does not result in percentage assessment. We conclude that the 50–100 percent provision

---

1. W.Va.Code § 18–9A–11 (1977 Replacement Vol.) provides, in pertinent part:

    The tax commissioner shall make or cause to be made an appraisal in the several counties of the State of all nonutility real property and of all nonutility personal property which shall be based upon true and actual value as set forth in article three [§ 11–3–1 et seq.], chapter eleven of this Code ....

    The statute further directs that the tax commissioner shall deliver the appraisal to county officials after its completion and they:

    shall use such appraised valuations as a basis for determining the true and actual value for assessment purposes of the several classes of property. The total assessed valuations in each of the four classes of property shall not be less than fifty percent nor more than one hundred percent of the appraised valuation of each said class of property.

    The Legislature amended the statute in 1980 to require that the total assessed valuation per class be at least 60 percent of the total appraised valuation per class. W.Va.Code § 18–9A–11(f) (Cum.Supp.1981). All references to W.Va.Code § 18–9A–11 in this opinion are to the pre-1980 version.

    Article 10, section 1 of the West Virginia Constitution provides, in pertinent part:

    [T]axation shall be equal and uniform throughout the State, and all property both real and personal, shall be taxed in proportion to its value to be ascertained as directed by law. No one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value ....

    What is now article 10, section 1 of the West Virginia Constitution originally was article 8 of the Constitution adopted in 1863. At that time, the provision read:

    Taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in proportion to value, to be ascertained as directed by law. No one species of property for which a tax may be collected, shall be taxed higher than any other species of property of equal value; but property used for educational, literary, scientific, religious, or charitable purposes, and public property, by law, shall be exempted from taxation.

    In 1872, the people adopted a new constitution in which the taxation provision became article 10. Language was added at that time which allowed the Legislature to tax "franchises and privileges of persons and corporations." The Tax Limitation Amendment of 1932 transformed article 10 into its present form.

does result in fractional assessment and therefore violates article 10, section 1 of the West Virginia Constitution.

## I.

■ It is axiomatic under the American republican form of government that "the representatives of the people must impose the taxes the people are to pay." 1 T. Cooley, *The Law of Taxation* § 21 at 84 (4th ed. 1924). This fundamental principle of government comes from England and precedes the American Revolution. It was recognized that imposition of taxes was a legislative power, and the sovereign could not levy taxes except as authorized by the representatives of the realm. *Id.* "No taxation without representation" subsequently became a rallying cry in the American colonies' fight for independence from the British crown, as evidenced by the list of grievances set out in the Declaration of Independence. That historic document condemned the British monarchy "[f]or imposing Taxes on us without our Consent."

The framers of the United States Constitution recognized the fundamental requirement of representative taxation in the organic law of this country when they gave sole authority "to lay and collect taxes" to Congress. U.S.Const. art. I, § 8. Similarly, the West Virginia Constitution vests in the Legislature the power to impose taxes. W.Va.Const. art. 10, §§ 1, 5, and 9. Thus, except as limited by the constitution itself, *see, e.g.,* W.Va.Const. art. 10, §§ 1a, 1b, and 10, the authority to impose general state taxes is a legislative power.

Article 10 of the West Virginia Constitution is both a grant of power to the Legislature to tax and a limitation upon that power. The limitation consists of a specific application of equal protection principles to a particular area of governmental action—taxation. The basic and fundamental premise of the provision is that "equal and uniform taxation" be the rule and not the exception. This requirement is emphasized further by language prohibiting the taxing of one species of property "higher than any other species of property of equal value." *See generally In re Assessment of Kanawha Valley Bank,* 144 W.Va. 346, 109 S.E.2d 649 (1959).

■ Article 10, section 1 further mandates that property subject to taxation be valued as "directed by law." Thus, the Legislature must prescribe a system or method by which property is valued. Such a system must accomplish the constitutional requirement of "equal and uniform taxation." These provisions have been fundamental State law since 1863 when the citizens of West Virginia adopted their first constitution.

In 1932, the people amended article 10, section 1 by ratifying what was popularly called the "Tax Limitation Amendment." That amendment established four classes of property and fixed maximum rates at which each class of property could be taxed. These rates ranged from $.50 to $2 per hundred dollars of valuation depending on the property's classification.[2] The amendment also authorized the Legislature to prescribe rates which could exceed the specific maximums. The people tempered this grant of authority by imposing several conditions on enactment of such "excess" levies. First, additional rates could be imposed for no more than three years at a time. Second, 60 percent of the voters had to approve the levy. Third, the added levy rate could be no more than 50 percent of the maximum rate.[3]

---

**2.** The maximum levy rate is $.50 per hundred dollars valuation for Class I property (tangible personal property, agricultural products, and intangible personal property); $1 for Class II property (residential and agricultural real property); $1.50 for Class III property (real and personal property located outside a municipality exclusive of Class I and II); and $2 for Class IV property (real and personal property located inside municipalities exclusive of Class I and II property). W.Va.Const. art. 10, § 1; W.Va.Code § 11-8-5 (1974 Replacement Vol.).

**3.** As a consequence, article 10, section 1 permits voters to impose upon themselves an additional $.25 per hundred dollars valuation on Class I property for up to three years. Since the maximum levy is $.50 per hundred dollars valuation, the total levy can be $.75. For Class IV property, with a maximum rate of $2 per hundred dollars valuation, the maximum excess levy is

Pursuant to section 1, the Legislature has prescribed the method of valuation and the levy rate for classes of property.[4] Over the years, the Legislature has responded to tax reform efforts and to increased revenue needs by enacting a variety of tax statutes. Some relate exclusively to property assessment and taxation while others also deal with financial support of public schools. *See, e.g.,* W.Va.Code §§ 11–1–1 to 11–8–33 (1974 Replacement Vol. & Cum.Supp.1981); 18–9A–1 to –20 (1977 Replacement Vol. & Cum.Supp.1981).

Valuation of property, establishment of the levy rate, determination and payment of taxes and distribution of revenue is a complex process which depends upon private persons and a variety of elected public officials, the duties for all of whom are prescribed by the Legislature, for successful completion. These officials include county assessors, *see, e.g.,* W.Va.Code §§ 11–3–1 to –30; county sheriffs, *see, e.g.,* W.Va.Code §§ 11A–1–1 to –18; and members of local levying bodies, such as county commissioners, city councilmen and school board members. The latter individuals, pursuant to statutory authority, actually fix the levy rate based on the assessment. W.Va.Code §§ 11–8–10, –12, –14. The state tax commissioner has the duty of supervising all of the valuation process. W.Va.Code § 11–1–2; W.Va.Code § 18–9A–11.

■ The taxation process consists of two important elements: valuation and levying.

Valuation is the act of placing a value on each piece of property. This phase of the process is sometimes referred to as assessment. W.Va.Code § 11–3–1. It is the responsibility of the county assessors, beginning with the property owner's appraisal, to fix the property's "true and actual value," subject to executive, legislative and judicial oversight. Executive oversight is provided first by the governor "who shall take care that the laws be faithfully executed," W.Va.Const. art. 7, § 5. The governor appoints the tax commissioner who must furnish the assessor with property appraisals, and must correct all incorrect assessments when county officials refuse to comply with the law.[5] W.Va.Code § 18–9A–11. Legislative oversight occurs through the Legislature's ultimate control of the assessor's and county commissioners' duties. Judicial oversight occurs through opportunities for *de novo* determination of assessment value, W.Va.Code § 11–3–25, as well as for judicial review of actions taken by Boards of Equalization and Review. *Id.*

■ Levying is the establishment and application of a rate of taxation upon the valuation of property, the result being the determination of the amount of the tax owed. For example, with the sales tax, the valuation is the amount of purchase. The levy rate is 5 cents per dollar. Thus, the tax on a five-dollar purchase (valuation) is 25 cents (5 cents X $5). In property taxa-

$1. Therefore, a total levy of $3 per hundred dollars valuation may be applied on this category of property.

4. Other provisions of article 10 also affect property taxation. Section 5 authorizes the Legislature to tax for discharge of the state debt, for support of public schools, and for payment of annual state operating expenses. Section 7 limits imposition of levy rates to 95 cents per hundred dollars valuation except for payment for schools and indebtedness which existed at the time of the constitution's adoption. Additionally, section 10, the "Better Schools Amendment," permits a five-year excess levy which cannot exceed 100 percent of the maximum levy rate established for school financing. As does section 1, section 10 requires approval by 60 percent of the voters for implementation of an excess levy.

5. It is important to note the difference between the term "appraisal" and the term "assessment" in regard to property taxation. Appraisal generally means the estimate of value given a particular item or piece of property. Appraisals are made for a variety of purposes. *See, e.g.,* W.Va. Code § 44–1–14 (1966) (appraisal of decedent's estate at true and actual value). W.Va.Code § 18–9A–11 requires the state tax commissioner to appraise all non-utility property in the state based on a true and actual value standard.

Assessment, however, is a more specific term used in a statutory sense to mean the listing and valuation of property for taxation purposes. W.Va.Code § 11–3–1; *Moore v. Johnson Service Co.,* 158 W.Va. 808, 219 S.E.2d 315, 319 (1975), citing, *Breckenridge v. County School Board,* 146 Va. 1, 135 S.E. 693 (1923). Like the tax commissioner's appraisals, assessments are to be based on true and actual value. W.Va.Code § 11–3–1.

tion, the levy rate is the total amount set by the various levying bodies: the state,[6] county commissions, local school boards, and municipalities.

The valuation-levying process begins with the assessment of property. The state constitution provides that each county may elect not more than two assessors. W.Va.Const. art. 9, § 1. The duties of assessors are prescribed by statute. W.Va. Code § 11–3–1 directs that assessors "assess" property yearly as of July 1 at its "true and actual value." The Legislature has defined true and actual value to mean "the price for which such property would sell if voluntarily offered for sale by the owner ...." *Id.*

The first step in the valuation process is a democratic exercise in which each taxpayer swears what he deems to be the "true and actual value" of his property. W.Va. Code § 11–3–2 mandates that assessors "shall call upon every person in the territory"[7] subject to taxation. Assessors must furnish each taxpayer with a form to list all real and personal property and the "true and actual value" of such property. The property owner must swear to the accuracy of this listing. W.Va.Code §§ 11–3–4, –12. Failure to complete the listing and valuation of property may result in a monetary fine, payment of back taxes, and loss of standing to contest assessments made by county or state officials.[8] W.Va.Code § 11–3–10.

To ensure citizen participation, it is the duty of each county commission to provide the necessary personnel to see that every taxpayer is called upon by the county assessor or deputies.[9] If the county commis-sion fails to provide the assessor with sufficient staff to complete this initial valuation, *see generally* W.Va.Code §§ 11–2–3, –4, the tax commissioner is empowered by statute to appoint special assessors to complete the task. W.Va.Code § 11–3–1. As provided by statute, the county commission must pay the salaries of such special assessors. *Id.* The self-valuation of property by taxpayers is designed to ensure democratic participation in the taxation process and to avoid oppressive government practices.

The state constitution and the state code clearly contemplate that the assessor and his deputies shall possess the necessary qualifications to appraise and assess property. The use of the term "assessor" implies that such officials possess special knowledge and capacity to appraise property and to assign a market value to it. Without such expertise, accurate valuation of property cannot occur.

The Legislature has given county assessors from July 1 to January 30 of the next ensuing year to complete the assessment of each item of property. Valuations given by the property owner for the guidance of the assessor may be considered by the assessor as evidence "to settle and determine" the actual value of each item of property." *Id.* The assessor must complete his assessment and deliver the county property books containing assessment values to the county commission, sitting as the Board of Equalization and Review, by February 1. W.Va.Code § 11–3–19. During the month of February, the commission must review the assessments to determine if they are at "true and actual value."

---

**6.** Article 10, section 1 limits the maximum state levy to $.01 per hundred dollars valuation.

**7.** The requirement that the assessor "call upon" each taxpayer cannot be satisfied by having a temporary employee leave a property listing form at the taxpayer's residence or business. The assessor or his deputy must make a good faith effort to personally contact each individual. Otherwise, the oath which is to be administered to the property owner cannot be accomplished since a property owner cannot swear to the listing's accuracy by himself. W.Va.Code § 11–3–4.

**8.** Owners of real property in this state have a constitutional duty to enter their land on the property books and to cause themselves to be charged with taxes. W.Va.Const. art. 13, § 6; *Don S. Co. v. Roach,* 168 W.Va. 605, 285 S.E.2d 491 (1981).

**9.** The failure of the assessor to deliver the property listing should not defeat the property owner's right to value his property. The assessor must either visit the property owner or notify the taxpayer to contact the assessor's office. If the assessor does neither, the taxpayer does not lose his standing to challenge any assessment entered by county or state officials.

W.Va.Code § 11–3–24. Individual property owners may appear before the commission to protest their assessments or those of other taxpayers. W.Va.Code § 11–3–24; *Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165 (1979). A majority of commissioners must certify that the annual assessment of property at true and actual value has been completed by February 28. W.Va.Code § 11–3–24.

The next step is for the assessor to total the assessed property valuations per class of property and certify them to all levying bodies in the county. W.Va.Code § 11–3–6. This must be done by March 7. *Id.* The levying bodies must meet between March 7 and March 28 to determine their fiscal condition and to set a levy rate which will produce sufficient revenue to meet oncoming financial requirements. Once estimates have been developed, the bodies meet in April to hear objections to either the proposed estimate of financial need or the proposed levy rate. W.Va.Code §§ 11–8–10a, –12a, –14a. After considering any objections by any person, the levying bodies must approve both an estimate of needed revenue and a levy rate. *Id.*

Actual collection of taxes begins when the levying bodies transmit the levy rates to the assessor. The rates are then applied to the property valuations by the assessor and the amount of tax owed then is determined. W.Va.Code §§ 11–8–11, –13, –15; W.Va.Code § 11–3–19. By June 7, the assessor must deliver the property books, complete with the amount of tax owed, to the county sheriff. W.Va.Code § 11–3–19. The sheriff must begin tax collection by July 15, twelve and one-half months after the first day of the valuation period. W.Va.Code § 11A–1–6 (1974 Replacement Vol.). Property owners may pay taxes in two installments—September 1 and March 1,—with the latter date being 21 months after the first day of the property valuation period.

Much of the revenue produced from property taxes is used to finance public schools. Therefore, statutory provisions relating to public school financing have overlapped into property taxation and have led directly to this case. In 1958, the Legislature adopted article 9A of chapter 18 of the West Virginia Code relating to public school financing. Section 11 of article 9A provides for computation of a county's local share of school funding and contains provisions relating to the appraisal and assessment of property. The statute requires the state tax commissioner to appraise all nonutility real and personal property in each county based on its "true and actual value." W.Va.Code § 18–9A–11. This appraisal presumably was completed by 1967 and thereafter was updated yearly.[10]

After an appraisal has been completed for a class of property in a county, the state tax commissioner must furnish the appraisal to the county assessor and county commissioners for use in the determination of assessed values. *Id.; see also Tug Valley Recovery Center, Inc. v. Mingo County Commission, supra.* Once the assessor has determined the assessed values, he must forward them to the tax commissioner for comparison with the commissioner's appraisal figures. The specific issue in this case is triggered under this statutory arrangement because W.Va.Code § 18–9A–11 purports to allow assessors to comply with the "true and actual value" requirement of W.Va.Code § 11–3–1 so long as their assessment totals, per class, are within 50 percent of the tax commissioner's appraisal values.[11]

## II.

With this constitutional and statutory background established, we now consider the events which led to this case. In Feb-

---

10. In his *amicus curiae* brief, the tax commissioner notes that his "current goal is to value all types of properties which the state appraises on 1980 market year values." However, the tax commissioner does not indicate when he expects to accomplish this task.

11. W.Va.Code § 18–9A–11 provides that "compliance with this section by the assessor and county [commission] shall be considered, pro tanto, as compliance with said chapter eleven."

ruary, 1981, the Logan County Commission, sitting as a Board of Equalization and Review pursuant to W.Va.Code § 11–3–24, approved assessment values for the 1980 assessment year. These values had been entered on the property books by the county assessor as the "true and actual value" of property in Logan County. Ray Killen, president of the Logan County Board of Education and a party to this action, objected to the values proposed by the assessor. He asked the Board of Equalization and Review to utilize appraisal figures calculated by the state tax commissioner as assessment values rather than those submitted by the assessor. Use of these appraisals would have increased the total valuation of property in the county. Killen claimed that the assessor had under-valued property in Logan County; therefore, the values suggested by the assessor did not comply with the "true and actual value" requirement of W.Va.Code § 11–3–1 or with the provisions of article 10, section 1 of the West Virginia Constitution which require equal and uniform taxation according to value.

The Board of Equalization and Review approved the assessor's valuations over Killen's objections and the school board president sought judicial review in circuit court pursuant to W.Va.Code § 11–3–25.[12] Killen named the county commission and the three county commissioners as respon-

dents in the action. At this time, individuals with extensive land and other property interests in the county (hereafter referred to as the taxpayers) intervened in the case on the side of the Logan County Commission.[13]

At trial, the parties agreed to certain facts surrounding property assessments in Logan County. First, they agreed that assessed valuations per class fell within the 50–100 percent range allowed by W.Va. Code § 18–9A–11. Second, they stipulated that the ratio of assessed-to-appraised valuation varied with individual property owners, and varied from the ratio of the total assessed valuations to the total appraised valuations per class of property. Third, the parties agreed that the tax commissioner's appraisals were based on information obtained in earlier years and differed according to the type of property.[14] Fourth, they stipulated that the ratio of appraised-to-assessed value for a particular class of property varied in different counties.

On cross-motions for summary judgment, the lower court ruled that W.Va. Code § 18–9A–11 was unconstitutional because assessment of property at a fraction of its actual value violated the requirement of equal and uniform taxation contained in article 10, section 1. Also, the trial court

12. W.Va.Code § 11–3–25 authorizes taxpayers to appeal assessments made by the assessors and those actions taken by the Board of Equalization and Review with regard to assessments to the local circuit court within 30 days of the board's adjournment.

13. Although a party to this action, the Logan County Commission did not file a brief nor participate in oral argument. The property owners who intervened below have been the real party in opposition to the Logan County Board of Education. In addition to the state tax commissioner, various other interested parties have filed amicus curiae briefs. These are the West Virginia Education Association, the Tug Valley Recovery Center, and West Virginians for Fair and Equitable Assessment of Taxes.

The tax commissioner argues that county assessors should retain discretion to set assessed values at less than appraised values and that assessors should retain primary authority over the assessment process. The remaining parties ask the Court to delay its decision until the lower court has completed its consideration of

Pauley v. Kelly, 162 W.Va. 672, 255 S.E.2d 859 (1979), on remand, Pauley v. Bailey, Civil Action No. 75–1278 (Kanawha County Circuit Court, May 11, 1982), and until the state tax commissioner has completed an up-to-date statewide tax appraisal. We note that the lower court has completed its consideration of Pauley; therefore, we do not agree that this Court should delay its decision of this case.

We do agree, however, that an up-to-date appraisal is needed and required by law. W.Va. Code § 18–9A–11. Use of the tax commissioner's present appraisals will not automatically ensure equitable taxation. Property is now undervalued in much of the state and the tax commissioner's appraisal values do not necessarily reflect the most recent market value of property. See Tug Valley Recovery Center, Inc. v. Mingo County Commission, 164 W.Va. 94, 261 S.E.2d 165, 174 n.5 (1979).

14. The appraisals of real and commercial property are based upon 1965 valuation factors, mineral interests upon 1977 valuation factors, and industrial property upon 1975 valuation factors.

concluded that both W.Va.Code §§ 11–3–1 and 18–9A–11 mandated assessment at true and actual value. However, the court interpreted the provisions of W.Va.Code § 18–9A–11, which permits up to a 50 percent discrepancy between appraised and assessed values, as merely a measurement of determining when a county had failed to carry out its responsibilities in funding schools or when an assessor and other county officials had failed to perform their duties. Thus, suggests the opinion of the lower court, the statute could be read as not authorizing fractional assessment.[15] The trial court, however, refused to adopt the tax commissioner's appraisals as the assessment values, despite finding that the Legislature had designed W.Va.Code § 18–9A–11 as a method of ensuring uniform statewide valuation. *See Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 881 (1979). The lower court offered to conduct *de novo* hearings to determine the "true and actual value" of the taxpayers' property. The lower court then certified the following question to this Court pursuant to W.Va.Code § 58–5–2 (1966):

> Does Chapter 18, Article 9(A), Section 11 of the Code of West Virginia, insofar as it provides that the total assessed valuation in each of the four (4) classes of property shall not be less than fifty percent (50%) nor more than one hundred percent (100%) of the Tax Commissioner's appraised valuations of each of said classes of property, violate Article X, Section 1 of the Constitution of the State of West Virginia, and therefore, is unenforceable and invalid?

### III.

To resolve the issue presented in this case, it is necessary to define "value" as that term is used in article 10, section 1 of the state constitution. That provision requires taxation of property according to its value to be ascertained as directed by law." To determine the meaning of "value," we have looked to the four traditional sources

of judicial definitions of words used in statutes and constitutions, but not specifically defined in them. These are: (1) dictionary definitions; (2) pronouncements by courts; (3) reliable extra-judicial commentary; and (4) definitions set or inferrable from debates and proceedings of the legislative bodies that drew the documents. *Pauley v. Kelly, supra.*

■ We have consulted numerous dictionaries with regard to the meaning of "value." The result is unanimous. From the time of Dr. Samuel Johnson and his first English language dictionary, value has meant the property's "worth" in terms of what sale of the property would bring on an open market. S. Johnson, *Dictionary of the English Language* (1st ed. 1755); S. Johnson, *Dictionary of the English Language* 992 (9th ed. 1805); J. Barclay, *Complete and Universal English Dictionary* 946 (1815); N. Webster, *American Dictionary of the English Language* 989 (15th ed. 1838); 12 *The Oxford English Dictionary* 29–30 (1933); W. Neilson, T. Knott, P. Carhart, *Webster's New International Dictionary of the English Language* 2814–15 (2d ed. 1941); D. Guralnik, *Webster's New World Dictionary* 1568 (2d college ed. 1980); E. Ehrlich, S. Flexner, G. Carruth, J. Hawkins, *Oxford American Dictionary* 767 (1980).

This definition of "value" is reflected in early statutes adopted in Virginia and later in West Virginia. In 1819, the Virginia Legislature enacted a statute directing assessors to value land at its "market price." Va.Code ch. 54, § 6 [1819]. Statutory provisions enacted after 1819 make specific references to assessment at value. *See, e.g.,* Va.Code ch. 35, § 20 [1849]. The first West Virginia assessment statute was modeled after these Virginia statutes. Consequently, it referred to assessment at *value*. 1863 W.Va.Acts. ch. 155. Subsequent amendments to that statute reinforce "market value" as the definition of value. In 1866, the Legislature ordered a reassessment of all real property in the state.

---

**15.** Indeed, W.Va.Code § 18–9A–11 specifically prohibits "use [of] a direct percentage application to the appraisal valuations."

Property was to be assessed at "the *fair cash value thereof in current money.*" 1866 W.Va.Acts ch. 33 (emphasis added). Also, the Legislature directed that individuals making the assessments had to certify them as the "fair cash value" of property. In 1868, the Legislature amended the statute with regard to appeals of assessments. The amendment provided that "no reduction shall be made in the assessed value of any such lands until the owner thereof files ... an affidavit stating the actual cash value thereof, and in no case, shall the assessments be reduced below the actual cash value." W.Va.Code ch. 129 [1868]. In 1904, when the Legislature adopted the forerunner of W.Va.Code § 11–3–1, the redundant adjectives "true and actual" appeared for the first time, emphasizing the constitutional meaning of "value." 1904 W.Va.Acts ch. 4, § 12. These provisions clearly show that value means the current "worth" of property in the open market.[16]

Case law, both in West Virginia and in other jurisdictions, reflects the common perception that value means worth. In *Chesapeake and Ohio Railway Co. v. Miller,* 19 W.Va. 408 (1882), the state auditor had assessed the railroad's property statewide and levied taxes on it.[17] The railroad company claimed that a state statute exempted its property from taxation until the company earned a 10 percent annual rate of return on capital. The Court ruled that article 10, section 1 of the state constitution required all property to be taxed in an equal and uniform manner according to value.

Thus, as early as 1882, 100 years ago, this Court determined that the state constitution requires all property to be taxed at its worth. When property is assessed at less than its market value, only a portion of that value is being taxed. In effect, the remaining portion is exempted from taxation. Thus, exemption of partial value (fractional assessment) is in reality partial exemption of property from taxation. As the Court declared 100 years ago,

> it was the intent of the framers of the Constitution to declare in most explicit terms that *all* property in the state should bear its equal share of the burden of Government, and there should be no property excepted from taxation, unless it was specifically excepted in the Constitution itself.

*Id.* at 435 (emphasis in original).

In another early West Virginia case, this Court defined taxable value as "fair cash valuation." *State v. Low,* 46 W.Va. 451, 458, 33 S.E. 271, 274 (1899). Our decisions involving requests for reduction of assessments to a percentage of market value all imply that value equals the property's worth. *See, e.g., In re United States Steel Corp.,* 165 W.Va. 373, 268 S.E.2d 128 (1980) (reduction of assessment from 100 percent of value to prevailing percentage granted).

Outside West Virginia, several jurisdictions have defined "value," as used in constitutional taxation provisions, to mean market value. For example, in *Arkansas Public Service Commission v. Pulaski County Board of Equalization,* 266 Ark. 64, 582 S.W.2d 942 (1979), the Arkansas public service commission had ruled that the Arkansas constitution permitted different treatment of varying types of property. The county board of equalization sought statewide assessment based on the property's market value. The Arkansas Supreme Court interpreted the use of the word "value" in a constitutional provision strikingly similar in content to West Virginia's as meaning market value.[18] *Id.* at 73, 582

---

16. The state tax commissioner has informed the Court that he equates the requirement of "true and actual value" assessment with "full value," "full cash value," "true value," and "market value." W.Va.Code § 11–3–1.

17. County assessors are responsible only for valuing non-utility property. The State Board of Public Works values property belonging to public utilities. W.Va.Code §§ 11–6–1 to –25 (1974 Replacement Vol.).

18. Article 16, section 5 of the Arkansas Constitution provides in pertinent part:

> All property subject to taxation shall be taxed according to value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value ....

S.W.2d at 945. *See also State ex rel. Park Investment Co. v. Board of Tax Appeals,* 175 Ohio St. 410, 412, 195 N.E.2d 908, 910, *cert. denied,* 379 U.S. 818, 85 S.Ct. 35, 13 L.Ed.2d 29 (1964) ("In essence, the value of property is the amount of money for which it may be exchanged, *i.e.,* the sales price."); *Parker City v. Spindletop Oil and Gas Co.,* 612 S.W.2d 944 (Tex.Civ.App.1981).

The role valuation plays in the taxation process reinforces the necessity of defining "value" as the property's market value. Valuation, the determination of value, constitutes realization of the tax base. Without an accurate determination of the tax base, equal and uniform taxation cannot be achieved.

> The success of the general property tax depends upon the quality of the assessments. If assessments are very unequal the foundation of the entire tax structure is unsound. Inequality of assessments means that those underassessed pay less than their fair share of public expenses and those overassessed pay their full share and, in addition, they have to make up for what the underassessed fail to pay. The greater the inequalities of assessment the greater the inequalities of the taxes and the more grevious the burdens upon those who find it most difficult to meet their obligations.

R. Blakey, *Report on Taxation in West Virginia* 107 (1930).

In 1921, the Tennessee Supreme Court emphasized this very point when it enforced the state constitution's requirement of equal and uniform taxation, "However difficult it may be to arrive at [full value assessment], it is imperatively commanded by the constitution and law. [Equal and uniform taxation] unavoidably and from necessity flows from [full value assessment], and to adopt a cash valuation is the only basis upon which it is practicable to make taxes equal and uniform." *Carroll v. Alsup,* 107 Tenn. 257, 283, 64 S.W. 193, 199 (1921).

Moreover, comments made at the time of the adoption of article 10, section 1 at the constitutional convention support a "market value" definition of value. In explaining the taxation process, the chairman of the taxation and finance committee stated, "For it must be remembered sir, that it is the value of any particular thing or object that is taxed, not the thing or object itself." 3 Debates, West Virginia Constitutional Convention, 1861–63 at 55 (remarks of Mr. Paxton). Thus, in explaining "value," another delegate stated, "I understand all property shall be taxed in proportion to its value. That is, if one horse is worth $5, tax it on $5, and if another is worth $125, tax it on $125." *Id.* at 71 (remarks of Mr. Sinsell).

Thus, dictionary definitions, the use of the word "value" in prior Virginia and West Virginia statutes, case law, and comments made at the West Virginia Constitutional Convention of 1861–63 lead to the conclusion that the term "value," as used in article 10, section 1 of the West Virginia Constitution, means the "worth in money" of a piece of property—its market value. We therefore reject the taxpayers' argument that value is such an elusive concept that the Legislature may provide those "shooting at the target" with a 50 percent leeway.

## IV.

■ Having defined "value," we now reach the fundamental issue in this proceeding. Is the language of W.Va.Code § 18–9A–11, which permits 50–100 percent assessment, consistent with the constitutional requirement of assessing property at its current worth? Or, in other words, does a fraction equal a whole? Because the term "value" means current market value, we conclude that the statute does not satisfy the constitution. Assessment at a percentage of appraisal value, with the percentage varying from county-to-county within and among the various classes of property, cannot achieve equal and uniform

This provision includes the same requirements contained in article 10, section 1 of the West Virginia Constitution. The provisions are merely worded in different order. *See supra,* note 1.

taxation. While assessment of property does not of itself result in taxation, it is an integral part of the taxation process. Therefore, in order to assure achievement of the constitutional mandate, assessment values must be determined at 100 percent of the market value as represented by the appraisal value. Any system which permits the setting of assessments at lower than 100 percent of "true and actual value" violates article 10, section 1 of the West Virginia Constitution.

The taxpayers, intervenors below, have devoted a substantial part of their brief to the proposition that legislative enactments are to be presumed valid. We agree. *See, e.g., State ex rel. Haden v. Calco Awning and Window Corp.*, 153 W.Va. 524, 528, 170 S.E.2d 362, 365 (1969). However, this Court has another duty which we firmly expressed 100 years ago in *Chesapeake and Ohio Railway v. Miller*, 19 W.Va. 408, 437 (1882).

> Much respect as we have for the Legislature, a co-ordinate branch of the government, we must pay greater respect to the sovereign will of the people expressed in the Constitution, which they have adopted for their own government. And where the court sees that the Legislature has plainly violated that instrument, it is the highest duty of the court, plainly required by the written Constitution, which it is its sworn duty to support, to pronounce such act of the Legislature unconstitutional.

The desire for equal and uniform taxation manifested in article 10, section 1 of the West Virginia Constitution can be traced to inequities in the Virginia taxation system prior to the Civil War. In 1850, eastern and western Virginians gathered to consider adoption of a new constitution. By this time, Virginia's population centers had shifted from the tidewater area to the western part of the state. Legislative representation, however, remained concentrated in the east, a fact which infuriated individuals who had migrated over the mountains and successfully established new lives. Eastern Virginia interests, recognizing the need to compromise, surrendered control of the House of Delegates, but retained control of the Senate. At the same time, however, the western delegates agreed to a taxation amendment which would provide favorable tax treatment to eastern agricultural interests. During the 1850s, the amendment resulted in inequitable taxation of some species of property because some types of property were valued at less than their market value. Farber, *Property Taxation In West Virginia—An Historical Analysis* (unpublished 1982) (on file at the West Virginia University College of Law).

During the 1861–63 constitutional convention, the West Virginia delegates quickly agreed upon the principle that taxation should be equal and uniform. After debate, they also agreed that the state constitution should set forth clearly the notion that different types of property with the same value should be taxed equally. The prevailing sentiment was that all citizens should pay their fair share of the cost of government. 3 Debates, West Virginia Constitutional Convention, 1861–63, at 55 (remarks of Mr. Paxton). Thus, the framers sought equal and uniform taxation on all property not exempted by the constitution. *Chesapeake and Ohio Railway Co. v. Miller*, 19 W.Va. 408 (1882).

The present system of equating assessments which are 50 percent of property's appraised value with true and actual value does not achieve the framers' intent and cannot achieve the constitutional requirement of equal and uniform taxation. One has only to look at the disparities in valuations within Logan County to reach this conclusion. If we multiply these disparities by the 55 counties, the concept of equal and uniform taxation quickly becomes meaningless.

The parties stipulated below that the total assessed valuations per class in Logan County met the minimum 50 percent ratio required by W.Va.Code § 18–9A–11. The percentage was 61.56 for Class I property, 59.16 for Class II property, 71.51 for Class III property and 57.99 for Class IV property. These figures do not represent the ratio that any one property owner may

have, but merely the aggregate total of all taxpayers with property of a certain category. Thus, as the parties stipulated below, some taxpayers' assessed values exceed the aggregate percentage and others fall below that figure. Consequently, some individual taxpayers are paying higher taxes because their property is valued at a higher percentage "of true and actual value," while their neighbors evade their civic duty.

This is true within a class of property and among the four classes in Logan County. For example, there exists almost a 14 percent difference between the aggregate assessment ratios for Class IV property and Class III property. With such disparity, equal and uniform taxation is an impossibility. Such a difference also violates the prohibition against taxation of property of equal value at a higher rate contained in article 10, section 1 of the state constitution. Class III property is currently valued at 71.51 percent of market value while Class IV property is valued at 57.99 percent. Items of property of the same value, but in different classes are being taxed at different levels because of the differences in classification and prevailing ratios. While Class IV property owners in Logan County may be happy with this system, Class III property owners are being treated inequitably.

The parties differ in their characterization of the aggregate assessment-to-appraisal ratio. The taxpayers contend that these ratios do not represent fractional assessments, but merely reflect a difference of opinion between the assessor and the tax commissioner as to the value of property. The taxpayers acknowledge that state law prohibits application of a percentage to true and actual value to determine the assessment value. W.Va.Code § 18–9A–11; *In re Pocahontas Land Corp.*, 158 W.Va. 229, 210 S.E.2d 641 (1974). Consequently, they argue that the assessor does not consciously value property at a percentage of true value, but assesses at what he believes to be true and actual value. This contention stretches the limits of credibility. *See In re United Steel Corp.*, 165 W.Va. 373, 268 S.E.2d 128 (1980); *In re Tax Assessment Against Pocahontas Land Corp.*, 158 W.Va. 229, 210 S.E.2d 641 (1976), for examples of deliberate assessment at a percentage of appraised value.

The school board makes two arguments. First, it argues that these ratios are fractional assessments which directly violate article 10, section 1 of the state constitution. The school board claims that assessors consciously decide to value property at a fraction of its market value sufficient to meet the requirements of W.Va.Code § 18–9A–11, but less than full value. Alternatively, the school board asserts that the 50–100 percent range in W.Va.Code § 18–9A–11 does not alter the requirements of true and actual value appraisal and assessment found in that statute and in W.Va.Code § 11–3–1. Instead, it interprets the 50 percent figure as a benchmark to determine when county officials have met their statutory obligation to provide public school funding, or to determine when removal of county officials is justified.[19] The school board argues that failure to meet the 50 percent figure triggers the penalty provisions of W.Va.Code § 18–9A–11.[20]

The divergent arguments presented in this case represent the historic and continuing battle over property taxation in this state. This struggle has been fought in

---

**19.** As the lower court correctly found, fractional assessment has been the practice in this state and such practice violates article 10, section 1 of the West Virginia Constitution. Therefore, the school board's alternative argument is of no consequence to the outcome of this case. Additionally, when county officials comply with the law, the need for a "trigger" percentage becomes pointless.

**20.** W.Va.Code § 18–9A–11 specifies that if the assessment-to-appraisal ratio falls below 50 percent, the county commission must allocate part of its tax revenue to the county school board to make up the difference between what was realized and what would have been realized upon 50 percent assessment. Additionally, the statute permits the tax commissioner to correct assessments which do not meet the minimum assessment ratio. Refusal of county assessors or county commissioners to comply with the provisions of this statute constitutes grounds for removal.

other states and no doubt will occur elsewhere. West Virginia has long been a state in which real property has been owned or controlled by out-of-state interests.[21] West Virginia historically has had a low tax rate in comparison to other jurisdictions, and property has often escaped taxation through undervaluation.[22]

It is important, however, to realize how this case differs from past property taxation decisions made by this Court. Historically, both here and in other states, property owners have sought to enforce their private right to uniform taxation, particularly when certain property has been assessed at a higher ratio of value than that of a neighbor. Such plaintiffs sought reduction of assessments, which in turn, reduced taxation as long as the levy rate remained the same. The United States Supreme Court sanctioned this approach in 1923. In *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923), the Court ruled that where uniformity of taxation and full value assessment could not be reconciled, uniformity took precedence. Thus, despite the presence of state law requiring assessment at 100 percent of value, the plaintiff was entitled to be assessed at the prevailing fraction of full value. *Id.* at 446, 43 S.Ct. at 192, 67 L.Ed. at 343. This Court has followed that approach in a series of cases,

the latest decided in 1980. *See In re United States Steel Corp.*, 165 W.Va. 373, 268 S.E.2d 128 (1980); *In re Tax Assessment Against Pocahontas Land Corp.*, 158 W.Va. 229, 210 S.E.2d 641 (1976); *In re Assessment of Kanwha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959).[23]

The leading reduction-in-assessment case is *In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959). The bank argued that valuation of its shares at 100 percent of true value violated the constitutional guarantee of equal and uniform taxation because other types of property had been valued at less than full value. In finding that the bank was entitled to a reduced assessment, the Court correctly held that article 10, section 1 contains two prohibitions on unequal taxation. First, the requirement that "taxation shall be equal and uniform" is a general statement of the rule. This language is emphasized by language which declares that "[n]o one species of property from which a tax may be collected shall be taxed higher than any other species of property of equal value." Thus, article 10, section 1 requires equality and uniformity both within species of property and among different species of property. Since the facts in this case show that wide disparities exist both within and among types of property, the

21. T. Miller, *Who Owns West Virginia?*, The (Huntington) Herald-Dispatch, Dec. 22–29, 1974, at 1; Appalachian Land Ownership Task Force, *Appalachian Land Ownership Study* (1981).

22. At present, there is no uniformity either as between the different counties or as between neighbors in the same village. The Commission has examined into this matter and finds that while in some counties property is assessed at its full market value, yet in others it is rated at one-half and in others again at less than half. The reason is this: the several assessors, whether of land or personalty, knowing that under our present method there is no recognized standard of valuation which is maintained and enforced throughout the state, have each adopted a standard of his own and in adopting his standard of valuation each assessor has endeavored to bring the property of his own county fully as low as the property of any other county; and be it observed, each assessor was unacquainted with the practice in other parts of the state, and

merely guessed at the standard of valuation elsewhere. Hence, gross, glaring and notorious inequalities exist.

West Virginia Tax Commission, *Report* 12–13 (1884).

Subsequent studies have commented on this historic practice. R. Blakey, *Report on Taxation in West Virginia* 107–11 (1930); H. Shamberger and J. Thompson, *The Operation of the Tax-limitation Amendment in West Virginia* 9–11 (1950) (real estate assessed at 30 percent of market value in 1949); E. Hanczaryk and J. Thompson, *The Economic Impact of State and Local Taxes in West Virginia* 32–35 (1958).

23. This is not an exhaustive list of cases, but merely a compilation of the more recent decisions. The constitutional question at issue here was not present in any of these prior cases. Thus, while they remain good law, they do not control the result of this case. *See In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959), for discussion of earlier West Virginia case law on property taxation.

holding in *Kanawha Valley Bank* supports the result reached here.

One West Virginia case, however, has departed from the reduction-in-assessment pattern. In *Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165 (1979), the appellant sought to enforce the public's right to equal and uniform taxation. We recognized in that case that state law provided third parties with standing to challenge the assessment values of property owned by others. We based this decision on the clear rationale that all taxpayers have an interest in the assessed values of other property since undervaluation of some property may lead to an unequal shouldering of the tax burden by others. While the appellant in *Tug Valley* sought only to raise the assessment of one property owner, it ultimately hoped to have the valuation set at the standard adopted here—market value.

This case turns upon the Constitution of West Virginia. Therefore, our decision does not depend on results reached in other jurisdictions in analogous cases. However, the question of full value assessment has become an increasingly litigated topic. While there has not been unanimous agreement, the majority of courts have found that state statutes or constitutional provisions analogous to those in West Virginia require assessment at 100 percent of property's market value. *E. Ingraham Co. v. Town of Bristol*, 144 Conn. 374, 132 A.2d 563 (1957) (statute); *McNayr v. State*, 166 So.2d 142 (Fla.1964) (statute); *Russman v. Luckett*, 391 S.W.2d 694 (Ky.1965) (constitution); *Bettigole v. Assessor of Springfield*, 343 Mass. 223, 178 N.E.2d 10 (1961) (statute); *Switz v. Middleton*, 23 N.J. 580, 130 A.2d 15 (1957) (statute); *Hellerstein v. Islip*, 37 N.Y.2d 1, 371 N.Y.S.2d 388, 332 N.E.2d 279 (1975) (statute); *Carroll v. Als-*

*up*, 107 Tenn. 257, 64 S.W. 193 (1921) (constitution and statute).

In general, cases involving statutory requirements of full value assessment have focused on language mandating valuation at "full" or "cash" value. However, at least one state supreme court has approved fractional assessment notwithstanding a legislative command to the contrary. *State ex rel. Park Investment Co. v. Board of Tax Appeals*, 175 Ohio St. 410, 195 N.E.2d 908, *cert. denied*, 379 U.S. 818, 85 S.Ct. 35, 13 L.Ed.2d 29 (1964).

A less-decided question has been whether state constitutional provisions require full value assessment. At least two jurisdictions, Kentucky and Tennessee, have held that their constitutions require assessment at market value.[24] Conversely, California and Virginia have interpreted constitutional provisions requiring full value assessment as allowing fractional assessment.[25] In these latter jurisdictions, the courts have accepted the argument that the historic practice of undervaluation has undermined the constitutional requirement of full value assessment and have declared their constitutional provisions to be in desuetude. We reject this proposition of law. The rule of desuetude is not the law of this jurisdiction. We find more persuasive and reputable the language of the Kentucky Supreme Court.

> In any event, we are dealing with fundamental law. It is not outdated, or obsolete, or contrary to any public policy we know of. The public has acquiesced in its nonobservance simply because personal rights were not adversely affected and citizens heretofore have not been inclined to compel executive compliance. This law today is just as vital and enforceable as the day it was written into the Constitution.

*Russman v. Luckett*, 391 S.W.2d 694, 697 (Ky.1965).

The Virginia Supreme Court acknowledged the requirement of full value assessment when it said, "We have consistently honored the breach of this rule by taking notice of the fact that most local taxing authorities apply a fixed multiple or percentage ... to fair market value in order to arrive at assessed value." 212 Va. at 149, 183 S.E.2d at 177.

**24.** *Russman v. Luckett*, 391 S.W.2d 694 (Ky. 1965); *Carroll v. Alsup*, 107 Tenn. 257, 64 S.W. 193 (1921). The Tennessee constitution has since been amended to allow fractional assessment. Tenn.Const. art. 2, § 28.

**25.** *County of Sacramento v. Hickman*, 66 Cal.2d 841, 428 P.2d 593, 59 Cal.Rptr. 609 (1967); *Fray v. Culpepper*, 212 Va. 148, 183 S.E.2d 175 (1971).

We conclude that the percentage ratio scheme contained in W.Va.Code § 18–9A–11 results in fractional assessment which is prohibited by the constitutional requirement of equal and uniform taxation as well as by W.Va.Code § 18–9A–11. As the lower court found, the Legislature has no authority to allow assessors discretion in determining the value of property. Value means the market value of the property. Equal and uniform taxation cannot result when each county assessor can vary assessments up to 50 percent of the appraised value both within and among classes of property. The fact that 55 assessors are granted this authority totally undermines any ability of the tax commissioner to assure equal and uniform taxation. As we have said, enactment of the statewide appraisal requirement reflects the Legislature's determination that uniform property assessment is the only way to assure uniform property taxation. *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, 881.

Achievement of uniform assessment and thereby equal and uniform taxation is a step-by-step process. Because the law directs that competent appraisers or expert examiners will be appointed by the tax commissioner to value property, the appraisal values are to be considered presumptive evidence of the assessed value. *Cf.* W.Va.Code § 11–1–2 (Tax commissioner "may appoint competent persons to appraise property values ... and may employ experts to examine and report upon the different kinds and classes of property in the State, with a view to ascertaining the true and actual value thereof for assessment purposes ..."). In this manner, the tax commissioner can make a determination of the market value of property, thus eliminating the *ad hoc* assessment system now in place by which 55 assessors make individual determinations subject to minimal supervision and oversight. As we noted in *Tug Valley Recovery Center, Inc. v. Mingo County Commission, supra*, "It is incumbent upon the circuit court, *as it would be upon the county commission*

*and the assessor, to set the assessed value of all parcels of land at the amount established by the State Tax Commissioner.*" 164 W.Va. at 108, 261 S.E.2d at 173 (emphasis added).

The statute itself supports this requirement. W.Va.Code § 18–9A–11 provides that the county officials "shall use such appraised valuations as a basis for determining the true and actual value for assessment purposes ...." This Court adheres to the view that "the use of the word 'shall,' without any modification unquestionably makes the direction therein mandatory." *Crusenberry v. Norfolk and Western Railway Co.*, 155 W.Va. 155, 159, 180 S.E.2d 219, 222 (1971); *see also UMWA v. Miller*, 170 W.Va. 177, 291 S.E.2d 673 (1982). Similarly, we recognize that the statute uses the term "a basis" in reference to use of the appraisal. Therefore, we interpret this term to mean that county assessors may consult other credible and reliable sources of information, *e.g.*, the property owner's *sworn* valuation and appraisal by bona fide appraisers, in determining the assessed value. W.Va.Code §§ 11–3–2, –4, –12; *see also In re Shonk Land Co.*, 157 W.Va. 757, 204 S.E.2d 68 (1974).

The lower court declined to adopt mandatory use of the tax commissioner's appraisal and instead offered to conduct *de novo* hearings on the question of the taxpayers' property values. The trial judge apparently believed that use of appraisal values would be a denial of due process to these taxpayers. Due process requires procedures by which taxpayers and other interested parties may challenge use of the appraisal values as assessment values if the former are either too high or too low. This can be accomplished by use of the procedures prescribed by W.Va.Code § 11–3–24. Once the assessor sets an assessment value,[26] the taxpayer may appear before the Board of Equalization and Review. W.Va. Code § 11–3–24. The Board may increase or decrease assessments to achieve "true and actual value." *Id.* If the taxpayer or other party still is unsatisfied, an appeal

---

**26.** Our holding does not alter the assessor's authority to correct incorrect assessments provided such changes are made on competent evidence and the tax commissioner is informed of all proposed changes. W.Va.Code § 11–2–6.

may be taken to the circuit court. W.Va. Code § 11–3–25, *Tug Valley Recovery Center, Inc. v. Mingo County Commission,* *supra.* The circuit court shall "correct the assessment, and fix the property at its true and actual value" if it determines an incorrect assessment has been made. W.Va. Code § 11–3–25.

■ Use of the tax commissioner's appraisal is premised in part on the need for assessment uniformity in both methodology and result. Therefore, the tax commissioner's appraisal should be presumed to be correct and the assessed value should correspond to the appraisal value in the usual case. An objection to any assessment value may be sustained only upon the presentation of competent evidence, such as that equivalent to testimony of qualified appraisers, that the property has been under- or over-appraised by the tax commissioner and wrongly assessed by the assessor. The objecting party, whether it be the taxpayer, the tax commissioner or another third party, must show by a preponderance of competent evidence that the assessment is incorrect.[27]

■ To maintain the integrity of the appraisal system, it is incumbent upon the county assessor and county commissioners to inform the tax commissioner of all challenges made to assessment values based on claims of under- or over-appraisal by the tax commissioner. The tax commissioner has a supervisory duty over both the county assessor and the county commissioners to establish assessments. It is the tax commissioner's duty to ensure that assessment occurs at market value. The tax commissioner must see that county officials are complying with the constitutional and statutory requirements of full value assessment. W.Va.Const. art. 10, § 1, W.Va.Code §§ 11–3–1, 18–9A–11. We note that W.Va.Code § 18–9A–11 gives the tax commissioner authority to set "the assessments at the required ratios [100 percent]" in a county. Thus, we recognize that the tax commissioner has the authority and duty to correct assessments in a county where local officials are unable or unwilling to comply with the law.

■ We wish to dispose of one final contention made by the taxpayers. They argue that the constitutional phrase "equal and uniform taxation throughout the State" does not mean what it says. They interpret this phrase to require only uniformity of methodology in determining value within a county. As already demonstrated, the existing "uniformity" of methodology has not, and cannot result in uniform taxation, either within a county or within this state.[28] Since article 10, section 1 of the West Virginia Constitution requires equal and uniform taxation in all areas of the state, both the method and the result of taxation are essential to compliance with the constitution.

■ The parties contest the propriety of applying our decision to the assessments made July 1, 1980, which are at issue here. The taxpayers argue that this would be retroactive application. We disagree. The

---

**27.** It is important to realize the difference in the burden of proof required in a *de novo* proceeding and the standard of judicial review utilized by courts when considering appeals of assessments. W.Va.Code § 11–3–25 allows taxpayers to contest the proposed assessment value before the Board of Equalization and Review. The preponderance of the evidence standard would apply to that proceeding. Under certain circumstances, (*e.g.* lack of notice or lack of appearance before the Board of Equalization and Review), a taxpayer may secure a *de novo* proceeding in circuit court. In such a case, the preponderance standard would also apply. However, when the taxpayer has appeared before the Board of Equalization and Review, judicial review by the circuit court and by this Court will be limited. Assessments fixed by the assessor or by the Board of Equalization and Review will not be set aside if there is substantial evidence to support them. *In re Tax Assessments Against The Southern Land Co.,* 143 W.Va. 152, 100 S.E.2d 555 (1957), *overruled on other grounds, In re Assessment of Kanawha Valley Bank,* 144 W.Va. 346, 109 S.E.2d 649 (1959).

**28.** As the Minnesota Supreme Court has said, "Since inequality between counties is as much a violation of constitutional requirements as is inequality within a county, merely to adopt the county as the taxing unit would fall far short of solving the many problems of inequality now existing." *Dulton Realty Co. v. State,* 270 Minn. 1, 17, 132 N.W.2d 394, 405 (1964).

issue being litigated in this proceeding is the legality of the 1980 assessments. Retroactive application would mean alteration of assessments made *prior* to the 1980 tax year.

We realize, however, that the valuation-levying cycle based on the 1980 assessments is well under way. In fact, taxpayers should have made their final installment payments on those assessments this past March. Additionally, the valuation-levying cycle for the 1981 assessment year is almost half complete. Taxes based on those assessments are due this September and next March. Therefore, the assessments already made in 1980 and in 1981 and the levy rates based on those assessments are to remain in force, provided they are otherwise lawful. This approach is in accord with the decisions of other jurisdictions which have held that full value assessments are required. *See, e.g., Hellerstein v. Islip,* 37 N.Y.2d 1, 371 N.Y.S.2d 388, 332 N.E.2d 279 (1975), *Russman v. Luckett,* 391 S.W.2d 694 (Ky.1965); *Switz v. Middleton,* 23 N.J. 580, 130 A.2d 15 (1957). Therefore, we hold that it is the duty of all county assessors to comply with the law. It is the duty of the tax commissioner to proceed with all deliberate speed to develop an up-to-date appraisal for each assessment year for all the 55 counties. The tax commissioner has a duty to appoint the necessary special assessors and appraisers to accomplish this end. W.Va. Code § 18–9A–11.

This Court is not unmindful that this decision may result in increased taxes to some, particularly those who have not paid their fair share in the past. However, if governmental expenditures remain the same, it should lower the taxes paid by other property owners.[29] Individuals whose property has been undervalued to any great extent face the greatest likelihood of increased taxes. Those whose property has been valued at or near its market value will benefit because others will be taxed on the same ratio of full value—100 percent. The tax commissioner has calculated that almost 40 percent of the value of taxable property in West Virginia escaped taxation in 1980. H. Rose, *Study of Property Valuations As They Relate To Levies Laid For The Support Of Schools In West Virginia For The Tax Year 1981* at VI (Dec. 1, 1981). This results in a disproportionate levy on the remaining 60 percent of value. Thus, with full valuation of property, the local levying bodies should be able to reduce the applicable levy rates.[30]

During the argument of this case, there was much discussion respecting who is ultimately responsible for establishment of property tax rates. Clearly, the Legislature has the duty and responsibility to levy taxes. W.Va.Const. art. 10. The Legislature has authorized local levying bodies to establish levy rates within constitutional and statutory limits. W.Va.Const. art. 10, § 1; W.Va.Code §§ 11–8–1 to –33. It is just as clear that county assessors are not involved in the process by which a levy rate is established and approved. The assessors mechanically apply the approved levy rates to the total assessed values of the county to determine the amount of tax owed. This duty is ministerial in nature. *In re National Bank,* 137 W.Va. 673, 73 S.E.2d 655 (1952), *citing, State ex rel. Hallanan v.*

---

**29.** For example, assume that the need for revenue remains static. Thus, a property owner whose property was valued at 70 percent of full value will pay more taxes when assessment becomes 100 percent of market value and the levy rate remains the same. Assume the levy rate was $2 per hundred dollars valuation. If the assessed valuations county-wide increase 40 percent, then the levy rate may be cut by an appropriate amount. Depending on the levy reduction, the property owner may pay less tax than before. Of course, the property owner whose property has been valued higher than the prevailing percentage is more likely to benefit than the person whose property has been under-valued substantially. This is simply because the latter group has further to go to bear its fair share of taxes.

**30.** The tax commissioner has calculated that the assessment-to-appraisal ratio was 61.40 percent for assessments made as of July 1, 1980. The total appraised valuation was $19,695,926,803 while the total assessed valuation was $12,093,-304,483. H. Rose, *Study of Property Valuations As They Relate To Review Laid For The Support Of Schools in West Virginia For The Tax Year 1981* at VI (Dec. 1, 1981).

*Rocke,* 91 W.Va. 423, 113 S.E. 647 (1922). Assessed valuations are independent of the levy rate process. Since assessments are calculated prior to establishment of the levy rate, no assessor knows what the exact levy rate will be. Conversely, the levy rate is tied directly to the assessment, in that the levy rate is properly determined by calculating the amount of revenue needed to finance government operations given the total assessed valuation. W.Va.Code § 11–8–3. As charged by the Legislature, it is the responsibility of these elected officials, ultimately responsible to the electorate, to decide whether the levy rate and property taxes increase, decrease, or remain at current levels. The levying bodies may never need to levy at 100 percent of their lawful capacity. It is their duty to set the levy rate and to determine the property tax paid by each taxpayer.

Given these relative duties and responsibilities of the assessors and the levy bodies, all prescribed by the Legislature, it is appropriate here to comment generally on the state-county relationship. Although the office of assessor is created by the constitution, the assessor's duties are prescribed by the Legislature. *State ex rel. Hallanan v. Rocke,* 91 W.Va. 423, 113 S.E. 647 (1922). For example, the Legislature has prescribed how the assessor is to value property, W.Va.Code § 11–3–2, when he is to value it, *id.,* and how he is to use the valuation. W.Va.Code § 11–3–19. The Legislature has given the state tax commissioner general supervisory and enforcement authority over assessors concerning establishment of those values. W.Va.Code §§ 11–1–2; 11–3–1; 18–9A–11. In other words, the assessor is answerable not only to the county commission, but also to the state in the person of the tax commissioner.

This example typifies the state-county relationship. It is not one of federalism, of co-sovereigns. Fifty-five sovereign entities do not exist within the sovereign state of West Virginia. Rather, 55 geographically-defined governmental organizations exist to carry out the purpose of state government. The counties are subdivisions of the state, and county officials and governments are generally subject to supervision by state officials acting for the state government. This fact is clearly reflected by the detailed statutory provisions which provide political subdivisions with their powers. *See, e.g.,* W.Va.Code §§ 7–1–1 to –11 (1976 Replacement Vol.) (county commissions). In the case of counties, the constitution sets the minimum territorial and population requirements, W.Va.Const. art. 9, § 8, but the Legislature prescribes the method for their creation. W.Va.Code § 1–3–2 (1979 Replacement Vol.). The foregoing does not alter the power of citizens of a county to achieve home rule by reformation of county government under the powers granted by article 9, section 9 of the West Virginia Constitution. *See generally Taylor County Commission v. Spencer,* 169 W.Va. 37, 285 S.E.2d 656 (1981).

We realize that today's decision will require some time for the various officials to obtain market value assessments on all property subject to the ad valorem tax. We also realize taxpayers may initiate litigation concerning equal and uniform or market value assessments. In actions which challenge an entire class of assessments, the State Tax Commissioner is an indispensable party because of his ultimate supervisory authority. Consequently, under W.Va.Code § 14–2–2 (1979 Replacement Vol.), the proper venue of such suit is the Circuit Court of Kanawha County. *See State ex rel. Ginsberg v. Watt,* 168 W.Va. 503, 285 S.E.2d 367 (1981); *Shobe v. Latimer,* 162 W.Va. 779, 253 S.E.2d 54 (1979); *State ex rel. Ritchie v. Triplett,* 160 W.Va. 599, 236 S.E.2d 474 (1977).[31] Moreover, in any such suit, the mere fact that the Tax Commissioner has not done his job will not automatically mean that the equal and uniform provisions of article 10, section 1 of the state constitution have been violated.

---

**31.** This type of action is to be distinguished from the procedures outlined in *Tug Valley Recovery Center, Inc. v. Mingo County Commission,* 164 W.Va. 94, 261 S.E.2d 165 (1979), where we recognized the right of taxpayers to challenge assessments of other taxpayers before the Board of Equalization and Review.

The ultimate issue which plaintiffs must prove is that property has not been assessed at market value.

Once assessments are calculated at market value, with the tax commissioner's appraisal used as presumptive evidence of that value, the need for reduction-in-assessment actions should be eliminated. As discussed previously, case law in this state has been concerned primarily with efforts by taxpayers to reduce their assessments because they had been assessed at a higher fraction of market value than other taxpayers. In the future, taxpayers who claim that they are being overassessed in relation to other taxpayers may not have their assessments reduced as long as their property is valued at market value. Instead, they should seek to have the assessments of other taxpayers raised to market value. *Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165, 173 (1979). Since fractional assessment is not lawful, taxpayers should not seek to reduce their assessments. The only lawful percentage is 100 percent of market value.

For the foregoing reasons, we hold that W.Va.Code § 18–9A–11 violates article 10, section 1 of the West Virginia Constitution. In answer to the certified question, we hold that W.Va.Code § 18–9A–11, "insofar as it provides that the total assessed valuation in each of the four (4) classes of property shall not be less than fifty percent (50%) nor more than one hundred percent (100%) of the Tax Commissioner's appraised valuation of each of said classes of property," violates the constitutional guarantee of equal and uniform taxation. A fraction does not equal a whole. Fifty percent does not equal 100 percent.

The state tax commissioner has a duty to do as the Legislature has instructed and his appraisals are to be considered presumptive evidence of property's "true and actual value." However, "any person claiming to be aggrieved"—property owners, the tax commissioner, other taxpayers,

or public officials—may challenge any assessment under the procedures set forth in W.Va.Code § 11–3–24. The assessor, the Board of Equalization and Review, or the circuit court may reduce or increase assessment values, provided that a preponderance of competent evidence shows that the commissioner's appraisal values do not represent "true and actual value." The certified question is answered in the affirmative.[32]

Affirmed.

NEELY, Justice, dissenting:

I respectfully dissent from the majority's opinion. I believe that the analysis of my brothers is technically flawed and, in large part, disingenuous, and that their decision is unnecessary and fundamentally wrong.

I

The words of Article X, § 1 of the West Virginia *Constitution* do not mandate or even imply the result in this case. The majority has focused in syllabus point 3 on the word "value," taken out of its context. The context in which the word "value" is found is as follows: "... taxation shall be equal and uniform throughout the State, and all property, both real and personal, shall be taxed in *proportion to its value* to be ascertained as directed by law." (Emphasis mine). The *Constitution's* command is that taxation be in *proportion* to value, and the current taxing system obeys that command. If the drafters of our *Constitution* had intended today's result, they could have required that property "shall be taxed at its value to be ascertained by law."

It should be obvious that the expression "in proportion to value" has a very different meaning from the word "value" alone, and in the past, this difference has not escaped us. In numerous cases we have required that taxation be equal and uniform in the sense that the tax paid by each

**32.** For a comprehensive three-part treatment of property appraisal and assessment issues, *see* Beebe and Sinnott, *In The Wake Of Hellerstein; Whither New York?*, 43 Alb.L.Rev. 203–93, 411–86, 777–860 (1979). *See also* Lesnick, *Does Full Value Mean Full Value? Prospects For Assessment Reform In New York In Light Of The Experiences Of Other States With Hellerstein's Progenitors*, 5 Hofstra L.Rev. 235 (1977).

taxpayer must be in the same *proportion* to the value of his property as the taxes paid by similarly situated taxpayers are to the value of their property. *See, In re United States Steel Corp.*, 165 W.Va. 373, 268 S.E.2d 128 (1980); *In re Assessment against Pocahontas Land Corp.*, 158 W.Va. 229, 210 S.E.2d 641 (1976); *In re Assessment of Kanawha Valley Bank*, 144 W.Va. 346, 109 S.E.2d 649 (1959).

I have no quarrel with the majority's definition of the term "value" and the exhaustive authority they marshal to support it. The majority can define value until they are blue in the face and still not escape the fact that the *Constitution* requires only that property be taxed *in proportion* to even admittedly full and fair value.

Furthermore, there is nothing in the phrasing of the *Constitution* to indicate that the dependent clause, "to be ascertained as directed by law," is intended to modify "value" alone. The clause could equally operate to mean that the proportion to value is to be ascertained by law. Indeed the West Virginia *Code* appears to give this provision such a reading: the law directs that the proportion to value be ascertained at "not less than fifty percent nor more than one hundred percent of the appraised valuation of each said class of property: Provided, however, that beginning July one, one thousand nine hundred eighty-one, the total assessed valuation in each of the four classes of property shall not be less than sixty percent of the appraised valuation of each said class of property." *W. Va. Code*, 18–9A–11(f) [1981].

Finally, even if one finds the majority construction convincing, it still does not require today's result. California and Virginia have articulated what I believe to be the correct rule regarding the revitalization of language in a state constitution after decades of desuetude. The supreme courts of Virginia and California have both faced constitutionally-based objections to discounted assessments where the state constitution required assessments at full value. Article 10, § 2 of the *Constitution* of Virginia requires that "all assessments of real estate ... shall be at their fair market value...", and § 1 directs that "all taxes... shall be uniform upon the same class of subjects...." Article 11, § 12 of the California *Constitution* states that "All property subject to taxation shall be assessed at its full cash value."

The Virginia Court held that there is only a "constitutionally required *relationship* between fair market value and assessment value (where uniform ratios are applied)", *Fray v. County of Culpeper*, 212 Va. 148, 150, 183 S.E.2d 175, 177 (1971) (emphasis added) and that they "have consistently honored the breach" of the literal rule "by taking notice of the fact that most local taxing authorities apply a fixed multiple or percentage... to fair market value in order to arrive at assessed value". *Id.* at 149, 183 S.E.2d at 177. The Supreme Court of California looked to the history of the adoption into the state constitution of the "full cash value" amendment, and concluded that since a discounted assessment was the practice at the time of the amendment, it "must be deemed to have incorporated into the *Constitution* the settled interpretation of its predecessor statute." *County of Sacramento v. Hickman*, 66 Cal.2d 841, 851, 428 P.2d 593, 599, 59 Cal.Rptr. 609, 615 (1967).

While there are moral injunctions in constitutional provisions like the Bill of Rights and its state counterparts which can, and should be, resurrected or rediscovered by courts, this is possible precisely because they are moral injunctions. Their resurrection can confound no legitimate reliance interest. The same cannot be said about provisions concerning taxation. Although the constitutional mandate of equal, uniform taxation arose from a bitter dispute with Eastern Virginia which had pronounced natural law overtones, the constitutional purpose of ensuring fundamentally equal taxation has long since been satisfied. It is inopportune of the majority to beat the "tyranny of taxation without representation" drum; a substantively neutral provision limiting the flexibility of local assessments to within a fixed percentage of the tax commissioner's appraisals cannot legitimately be equated to the discriminato-

ry system of taxation under which Western Virginians chafed before our independence from Virginia.

## II

Courts are not infallible in their readings of statutory or constitutional language, but it is unfortunate when such an error is made by a court of final appeal. In this case the tragedy is that by insisting on applying their erroneous reading the majority has improperly intruded into the province of the legislature. The issue of taxation is, probably more than any other subject, first and last an issue for the legislature. It is the classic political question into which courts should not intrude themselves.

There are uses and abuses of the "political question" doctrine. When a court avoids a truly justiciable question arising from a constitutional provision, and that constitutional provision illuminates a moral imperative, the "political question" doctrine becomes nothing more than the means for a flight from responsibility. On the other hand, when there is an entire matrix of legislative acts, court decisions, and executive policies predicated upon an existing political structure that reflects the rational and completely moral accommodation of conflicting interests, it is improvident for a court to intrude itself gratuitously. There is no issue known to the law or to politics that cannot be phrased by skilled lawyers in constitutional terms; if timidly avoiding truly justiciable controversies is a vice, then straining, contorting, and twisting constitutional language in order to achieve a value-mandated result that reflects nothing but the personal preferences of judges is as great a vice.

The "political question" justification for declining to decide an issue must be predicated upon a careful analysis of the matrix of political accommodations that a particular court decision is likely to disturb.[1] In this case such an institutional analysis compels the conclusion that an application of the "political question" doctrine is fitting in this case, and that therefore it is temerarious of this Court to substitute the majority's political values for those of the legislature and the executive. Politics is the process of accommodation. The only group in society today whose values are entirely vindicated is the courts, and I dissent to that proposition.

## III

There is little more to law than its application, and its application is determined by institutions. The value of *stare decisis* is not only that it protects reliance interests, but also that the doctrine helps provide a stable environment in which the institutions which apply laws can grow and change gradually. A successful analogy can be made to the situation in which an oyster finds himself when a piece of sand enters his shell. He cannot dislodge it, so he accommodates himself to it by encasing it in pearl. Similarly, law, even bad law, is made livable and useful by institutional coatings. Shattering the pearl in order to remove the speck of sand would be a foolish tactic, yet that is exactly what this Court has done.

The ramifications of this decision are many. First and foremost, we have today raised taxes. The majority opinion observes that "the framers of the United States *Constitution* recognized the fundamental requirement of representative taxation in the organic law of the country when they gave sole authority to lay and collect taxes to Congress. *U.S.Const.*, art. 1, § 8. Similarly, the West Virginia *Constitution* vests in the legislature the power to impose taxes." However, by requiring that property be assessed at its full appraised value, the Supreme Court of Appeals has raised

---

1. For what it is worth I have elsewhere tried to construct a practical theory to explain where and when courts should intrude themselves into the political process based on the nature of political institutions. The reason I wrote an entire book on the subject was so as not to have to explain the theory piecemeal in concurring and dissenting opinions. Consequently, for the reader who is not entirely satisfied with my brief reference to the continued viability of the "political question" doctrine, a more elaborate analysis of my position is to be found in R. Neely, *How Courts Govern America*, Yale University Press (New Haven and London, 1981).

property tax bills by an average of over 60%.[2]

While the majority points out that levying bodies may now reduce their levy rate to maintain taxes as they are, I doubt that this will occur. The pressures on the county commissions are probably such that they will quickly use all money available to them. The counties may, in fact, be prohibited from lowering their levy rate in response to the rise in assessments this Court now demands. *W.Va.Code*, § 18–9A–10 [1982] was amended in 1981 to penalize counties that fail to lay the maximum regular tax rates provided by the *Code* by reducing financial benefits to county schools.[3]

## IV

Property taxes are among the most regressive taxes available to a sovereign. They look to the value of one's property, not to one's ability to pay. Thus a working-class West Virginian might save and struggle all his life so that from the age of fifty on he and his family can enjoy a house worth $150,000, while a dentist fresh from the West Virginia University Dental School might purchase such a house at the age of 27. While both the ordinary worker and the dentist have property of equal value, they assuredly have differing capacities to pay a property tax. Where the lion's share of a political subdivision's revenue comes from taxation of property, the worker making $25,000 a year bears the same tax burden as the dentist making $95,000 a year.

2. Local Government Relations Division, State Tax Department, *Study of Property Valuations as they Relate to Levies Laid for the Support of Schools* (December 1981), p. VI. The study states that in 1981 the statewide ratio of assessed value to appraised value was 61.40%. A raise to 100% will therefore increase current taxes by 62.86645%.

3. This amendment was, of course, not designed with this purpose in mind, but rather to foreclose any "free rider" problems in the administration of the school fund. The unforeseen effects of the amendment are an example of the maleficial consequences of judicial meddling in

Considerations going to the regressive nature of property taxes in general have led West Virginia to select other taxes of a less regressive nature whenever needs for more revenue have appeared in recent years. The *Constitution* has been amended in order to fix maximum rates for *ad valorem* property taxes, thereby all but eliminating the property tax as a source of revenue for state government.[4] *W.Va. Const.*, Art. X, § 1 (adopted by amendment in 1932). Revenue demands have been met by enacting various alternative tax measures, including the business and occupation tax and the consumer sales tax in 1933, the cigarette tax in 1947, the soft drink tax in 1951, the personal income tax in 1961, and the carrier income tax and corporation net income tax in 1967. Although some of these taxes are more progressive than others, all are substantially more progressive than the property tax. Income taxes are, of course, by definition progressive. The business and occupation tax is at least levied on the basis of volume of business, if not on profitability. The consumption, or value-added taxes are progressive in the sense that they tax a transaction from which, particularly in the case of luxury or unnecessary items, citizens may abstain.

The State of West Virginia funds with these taxes a uniquely high proportion of county school costs.[5] The policies inherent in the property tax limitation amendment have led the State practically to take over the financial support of county schools. The majority writing in *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859 (1979) made the observation:

a complex matrix of pre-existing political accommodations.

4. Currently, 99½ percent of property tax revenue remains in the counties. *Study of Property Valuations, supra*, p. ii. This revenue is insufficient to fund the counties, however, so the property tax limitation amendment in effect requires vast transfusions of state revenue to the counties. It operates not as a limitation on county revenue, but as a limitation on the amount of revenue a county is permitted to receive from the regressive property tax.

5. Appendix IV to *Pauley v. Kelly*, 162 W.Va. 672, 255 S.E.2d 859, at 893 (1979).

The Legislature almost forty years ago recognized that: "Because of the adoption of the 'Tax Limitation Amendment', it has become necessary for the State to participate to an increasing degree in the financing of the free public schools." *W.Va.Code*, 18–9B–1. It passed what is now *W.Va.Code*, 18–9B–1, *et seq.*, creating the State Board of School Finance and giving it a variety of administrative and budgetary powers over county boards of education.

*Id.*, at 882.

This is a good example of the oyster and pearl phenomenon. In order to mitigate the effects of regressive taxation the property tax limitation amendment was added to the State *Constitution*. This forced the State to fund the lion's share of county education through its more progressive taxes. The elaborate provisions of Articles 9, 9A and 9B of Section 18 of the West Virginia *Code* created an entire bureaucracy to permit and oversee the transfer of State funds received from other sources than the property tax to county schools in order to finance the bulk of county school expenses with revenues not derived from the regressive property tax.

Now it appears that this long and arduous legislative effort is for naught. The Court has permitted the Logan County Board of Education a judicial end run around this legislative bulwark, and handed over to it the fruits of a regressive tax which the bulwark was deliberately erected to protect.

This legislative protection of West Virginia's citizens from the regressive property tax is not limited to school finance. In 1972 the Federal Grants and County and Municipal Aid Amendment to the West Virginia *Constitution* was proposed and ratified. *W.Va.Const.*, Art. X, § 6a. This amendment provided that state taxes could be imposed or dedicated "for the benefit of and use by counties, municipalities and other political subdivisions of the State for public purposes." *Id.* This amendment al-lowed the State to funnel revenue from more progressive taxes to the counties, thereby limiting the regressive tax burden on West Virginia's citizens. Today's decision thus violates a clear legislative policy disfavoring regressive taxes.

### V

The majority opinion speaks darkly of "out-of-state interests" who own the land. However, most land in West Virginia is held by West Virginia residents or businesses. Evidence has been presented before the Court in this case that the small, individual landowner bears a disproportionate weight of the tax burden in West Virginia because of inequitable appraisals by the State Tax Commissioner himself resulting from delays in the state-wide reappraisal demanded by the legislature.[6] Enforcement of the one hundred percent assessment by the same official will therefore only serve to increase the disproportionality of the tax burden.

The majority should have considered that for every coal company that underpaid its taxes, there will be countless retired couples (the favorable exemptions going to the very poor notwithstanding) who will either lose their homes because they cannot pay the court's new tax, or will otherwise be required to live in penury during their declining years because this Court has imposed upon them an unconscionable, regressive tax that would never have been countenanced by their elected officials. Finally, since the commissioner of commerce is constantly soliciting bigger and better "out-of-state interests" to come to West Virginia to open factories and mines, it appears that out-of-state interests are not entirely pernicious.

### VI

In this year 1982, the United States is suffering the worst economic conditions since the Great Depression. More to the point, states of the Northeast and North Central regions, like West Virginia, are

---

**6.** Appalachian Regional Commission; "Severed Wealth/Severed Future: An Examination of the Extent and Impact of Large Scale Land Owner-ship in West Virginia", 7 *Appalachian Land Ownership Study*, 29–38 (Wash., D.C., Nov. 1980).

suffering proportionately more than the rest of the country since they are the states where mature industries, often with obsolete plants, are located. West Virginia at this moment has one of the highest unemployment rates in the country. Property taxes tax business in proportion to the value of its property holdings and not in proportion to profitability. Land-intensive businesses, for example, that are on the margin today in the sense that they are just hanging on waiting for an upturn in the economy, but still employing a full or partial labor force, may find a forty percent increase in their property tax bill to be the proverbial, back-breaking straw.

At the same time, states like Texas and Louisiana are extremely aggressive in their competition for industry. Taxation is inextricably intertwined with both a state's ability to attract new industries and the continued vitality of a state's existing industries. The political authorities in this State are entrusted with designing our strategy for competing successfully in the national market for industries, and taxation is an essential element of any such strategy. What this Court has done is to increase taxes significantly at a time when the executive and legislative branches must be able to tinker with the economy. We have thus severely reduced the freedom of action of the elected[7] branches in exactly the area where a high degree of responsiveness is most required.

The argument that I make concerning the effect of taxation on West Virginia's attractiveness to industry might appear to the untrained observer to be unjustified. After all, the level of local taxation is not the only criterion upon which industry bases its location decisions. The quality of labor is one important consideration, as is the degree of labor strife or cooperation.

The transportation costs of moving raw materials to plants and of moving finished products to customers are also important factors, along with countless other considerations of a similar nature.

Certainly no one will observe a wholesale removal of plants from West Virginia as a direct result of today's majority ruling. The process is far more subtle and obscure; furthermore, it is not wholesale removal but rather removal at the margin that requires careful consideration. Only a one percent change in employment can have a substantial effect on West Virginia's economy. Consequently, perhaps a real life example will illuminate the problem.

The Union Carbide Corporation employs approximately 10,000 men and women in four plants in West Virginia. Three of these plants, namely the South Charleston, Institute, and Sistersville plants, produce a diverse range of plastics and chemicals. While these three plants occupy individual parcels of land, each is not just one plant, but really many plants. Within, for example, the South Charleston plant numerous unrelated chemical processes are undertaken, and many different end products manufactured.[8] Each separate process is constantly being modernized; every year certain equipment and even total systems for the manufacture of individual products become obsolete, and must be replaced. Thus a chemical plant, like the human body which entirely regenerates itself every seven years, is constantly undergoing minor transformations. In effect, a chemical plant is itself a process.

Union Carbide also has plants outside of West Virginia, among them the Taft, Louisiana plant and the Brownsville, Seadrift, and Texas City plants in Texas. All of these plants are capable of carrying on the

---

7. We are of course elected officials as well, but the twelve-year duration of our terms serves to indicate that in the system of government we are not intended to be responsive in the same sense or to the same degree as popularly elected legislators, or a popularly elected governor.

8. The South Charleston Plant, opened in 1925, now spreads over 230 acres and employs a labor force of 1,375. The plant produces more than 450 different chemicals and plastics including polyols, silicones, propylene glycol, alkanolanimes, ethers, ketones, vinyl resins, synthetic oils and plasticizers, which find application in everything from brake fluid to chewing gum. Interestingly, the original construction of the plant was primarily to satisfy a three million pound contract for a chemical to keep dynamite from freezing. That chemical later became the base for PRESTONE antifreeze.

chemical processing currently going on in the West Virginia plants. Consequently, while today's decision will not result in the immediate closure of the Union Carbide plants in this State, it does harm the business climate. Our decision could encourage the slow transfer of functions carried on in West Virginia today to other locations outside the State as the equipment used for those functions in West Virginia becomes obsolete, and is replaced elsewhere in Union Carbide's corporate system. This phenomenon is called by economists "marginal change."

Unfortunately for the State, the relationship between taxation and the health of West Virginia industry is no less real for its subtlety; over time we are likely to suffer a deterioration in our competitive position because of this Court's decision today.

## VII

Article IX, § 1 of our *Constitution* directs that "the voters of each county shall elect ... one and not more than two assessors, who shall hold their respective offices for the term of four years." The inescapable implication of the Constitutional requirement that assessors be elected is that they are expected to be, in some sense, representative. The majority decision postulates vigorously the principles that there should be no taxation without representation, and that the representatives of the people must impose the taxes the people are to pay. This artful rhetorical smoke cannot obscure the actual effect of their decision. The elected office of the assessor has been emasculated, and the assessors have been made the minions of an appointed central taxing authority.

Such an interference with the political balance is inexplicable on the basis of true and uniform valuation requirements. If we are to have to live with the majority's construction of the Constitutional valuation requirement, it would still have been possible, from a mechanical point of view, to have enjoined the local assessors to assess property at its "true and actual value," leaving to the Tax Commissioner only the overall supervisory powers currently attendant on that office.[9] It is unnecessary to mandate that the commissioner's appraisal be the standard. In a matter as changing and complex as the calculation of property tax, the simplistic conclusion that the appraisal equals the fair market value will be accurate only coincidentally.

The practice of allowing local assessors to establish the property tax value, subject to the legislative requirement that their assessments total no less than fifty percent (now sixty percent) of the commissioner's appraisal, has long been accepted in West Virginia. The majority questions whether the elected assessors should set the proportion of taxes by the assessment percentage or the levying body should do so through levy rates, and concludes that the "proportion to value" should be determined by the levying body. There is no cogent authority for that proposition to outweigh the force of a long-established custom based on political practicality, particularly in light of the rigidity of those levy rates, discussed *supra*.

The custom of permitting elected assessors to establish the relationship between value and assessment has become an integral part of the taxation process, allowing for local relief from the State Tax Commissioner's appraisals on a large scale and without the expense and nuisance of having to resort to court on a case by case basis.[10] Courts can now expect a deluge of litigation; given the small staff of the tax commissioner and that staff's unfamiliarity

---

**9.** The legal machinery for concerned citizens to challenge any assessments which would not conform to a "true and actual value" standard enacted by this Court is, in fact, already established. *Tug Valley Recovery Center, Inc. v. Mingo County Commission*, 164 W.Va. 94, 261 S.E.2d 165 (1979).

**10.** One reason for permitting assessments to be only a proportionate percentage of actual value

is to avoid constant litigation over what property is worth. In today's economy a house that would have been worth $200,000 in 1977 may only be worth sixty percent of that today. Where assessments are based on only about sixty percent of the "full value" debates of this type are obviated.

with property in the fifty-five counties, I should think the commissioner's evaluations are hardly precise.

### VIII

There is a final irony to the majority's ill-advised and destructive foray into the realm of tax assessments. This catastrophic endeavor was undertaken to ensure that "taxation shall be equal and uniform throughout the State" *W. Va. Const.*, Art. X, § 1, and yet the decision does not require that any county levy (through the county commission) at exactly the same rate as other counties. "... blind guides, which strain at a gnat, and swallow a camel." Matthew 23:24.

MILLER, Chief Justice, concurring:

While I concur with the majority opinion, it seems to me that some clarification might be added to it, particularly in light of the dissenting opinion.

First, it cannot be doubted, and the parties to this litigation do not assert otherwise, that we are confronted with two statutes that contain irreconcilable language. The first is W.Va.Code, 11–3–1, which provides in material part:

"All property shall be assessed annually as of the first day of July at its true and actual value; that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, ..."

The second statute is W.Va.Code, 18–9A–11, which, in relevant part, states:

"The tax commissioner shall make or cause to be made an appraisal in the several counties of the State of all non-utility real property and of all non-utility personal property which shall be based upon true and actual value as set forth in article three [§ 11–3–1 et seq.], chapter eleven of this Code.

\* \* \* \* \* \*

"[A]fter such appraisal is so delivered and received, the county assessor and the county court, sitting as a board of equalization and review, shall use such appraised valuations as a basis for determining the true and actual value for assessment purposes of the several classes of property. The total assessed valuation in each of the four classes of property shall not be less than fifty percent nor more than one hundred percent of the appraised valuation of each said class of property."

The clear import of W.Va.Code, 18–9A–11, is that while the tax commissioner shall make appraisals of real and personal property "based upon true and actual value," the local assessors are empowered to set the local assessments between fifty and one hundred percent of the true and actual value appraisements made by the State tax commissioner. However, the fifty to one hundred percent assessment setting authorized by W.Va.Code, 18–9A–11, obviously conflicts with the plain requirement of W.Va.Code, 11–3–1, which requires assessors to assess "at its true and actual value." An assessor who is required by W.Va.Code, 11–3–1, to assess at "true and actual value" can hardly square this duty with W.Va.Code, 18–9A–11, which enables him to assess at fifty percent of the true and actual value.

The majority resolves this conflict between these two statutes by looking to the provisions of Section 1 of Article X of the West Virginia Constitution to determine the meaning of the phrase "all property both real and personal shall be taxed in proportion to its value." There can be no doubt that under our real and personal property tax statutes, as is common elsewhere, the assessor's value or what is commonly called the "assessed value" of property is what is entered on the property books. It is against this value that the applicable tax or levy rate is calculated. These tax rates are set out in W.Va.Code, 11–8–1, *et seq.*, which allocates them to the various local governmental entities.

The dissent proceeds on a misconception that our constitutional phrase which reads "and all property ... shall be *taxed* in proportion to its value" should be read to mean that "all property ... shall be *assessed* in proportion to its value." (Emphasis added) Obviously, there is a total dif-

ference in meaning between the word "taxed" and the word "assessed." As previously indicated, "taxed" refers to the amount of the levy rate and this is expressed throughout W.Va.Code, 11–8–1, *et seq.*, as so many cents "on each one hundred dollars" of assessed value. W.Va. Code, 11–8–6.[1] Thus, the dissent, by substituting the word "assessed" for the word "taxed" in Section 1 of Article X, avoids discussing the real issue in the case—which is the meaning of the word "value."

As the majority opinion demonstrates, our constitutional phrase "taxed in proportion to its value" is found in other state constitutions. Courts that have had occasion to construe this phrase have rather uniformly determined that the term "value," standing alone, is deemed to mean fair market value or actual value or some other equivalency.

A case cited by the majority and one that is closely analogous to our present situation is *Arkansas Public Service Commission v. Pulaski County Board of Equalization*, 266 Ark. 64, 582 S.W.2d 942 (1979). Section 5 of Article 16 of the Arkansas Constitution contains a provision quite similar to ours that "[a]ll property subject to taxation shall be taxed according to its value." The Arkansas Legislature had, in 1973, passed a statute which had this effect "under Act 411, residential values were 'frozen' as of 1956, and timber and farm land values were 'frozen' as of 1961." 266 Ark. at 722, 582 S.W.2d at 944. The Arkansas Supreme Court concluded that the constitutional term "value" meant in effect present or true value and that the statute was unconstitutional:

"But the larger question relates to the meaning of the word 'value,' Article 16, § 5, requiring that '[a]ll property subject to taxation shall be taxed according to its value.' An illustration which is perhaps overly simple serves to drive home the meaning of the word 'value.' If an individual displays an article, be it an article of jewelry, an automobile, or even if a house is being sold, and is asked the question, 'What is its value?', the answer, of course, is the value of that property today—not what it was worth in 1956 or 1961—or any other year. The constitutional requirement, it would appear, undoubtedly means 'present value,' because its value in some other year would almost certainly not be the same as the current value, and accordingly, if some other basis is used, would not be its true value at all." 266 Ark. at 72–73, 582 S.W.2d at 945.

In reaching this conclusion, the court noted that the Legislature had since its earliest days after the formation of the State utilized in its assessment statutes language that gave recognition to the fact that the constitutional term "value" meant fair market value. A similar pattern can be found in our own assessment statutes. In Section 67 of Chapter 157 of the 1863 West Virginia Code, the affidavit of value submitted by the owner of property contained the following affirmation: "[T]hat in my opinion the valuations of the property listed are not below the fair cash value thereof: So help me God."

In 1904, the assessment language was changed to that which is presently found in W.Va.Code, 11–3–1, requiring property assessments to be at true and actual value.[2]

---

**1.** The entire purpose of W.Va.Code, 11–8–1, *et seq.*, is to divide the maximum tax or levy rates (the terms are interchangeable) set in Section 1 of Article X of our Constitution among the various governmental entities who are entitled to share in property tax revenues. The constitutional maximum rates are recognized in W.Va. Code, 11–8–6, which provides:

"The aggregate of taxes assessed in any one year by all levying bodies, except as provided by section twenty-three [§ 11–8–23] of this article, shall not exceed fifty cents on each one hundred dollars' assessed valuation on Class I property; one dollar on Class II prop-

erty; one dollar fifty cents on Class III property; and two dollars on Class IV property."

**2.** Section 12 of Chapter 4 of the 1904 Acts of the Legislature, in material part, provided:

"All property, both real and personal, in any county, except as herein otherwise expressly provided, shall be assessed as of the first day of April [currently July] of each year at its true and actual value; that is to say: at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually sold, and not the price which might

This longstanding legislative concurrence as to the meaning of the constitutional term "value" is significant.[3] Moreover, and despite general contrary assertions by the dissent, none of our previous decisions in regard to Section 1 of Article X have ever held that the Constitution sanctioned assessments at less than the true and actual value.[4]

Finally, I must take exception to the dissent's characterization of this case as a "political question" and that somehow we should have avoided deciding this case. The dissent overlooks the fact that the case had already been decided by the Circuit Court of Logan County. We occupy the position of being the final arbiter of our State's law. We would do no credit to our office and our oath if we avoid complex or controversial cases by refusing to decide them under the guise of calling them "political issues." To make such an assertion is to ignore all of the tax cases that have been decided by this Court in the past.

Surely, the test of whether a given opinion is correct cannot be based on whether it will gain popular acceptance by all who will feel its impact. If this were the yardstick, no court would hold any tax measure proper. Reference need only be made to *Bee v. Huntington*, 114 W.Va. 40, 171 S.E. 539 (1933), to find the true measure for a court. There, this Court was confronted with the then recent amendment to Section 1 of Article X of our Constitution, which had set the maximum tax or levy rates that could be charged against the various classes of real and personal property. The practical effect of this amendment was to seriously curtail the amount of property tax revenues that had been formerly available to local governmental bodies.

The Legislature, in response to the outcry for more funds by the local governmental units, had enacted a statute to permit the local levying bodies to exceed the constitutional maximum levy rates by utilizing "additional levies 'to meet current requirements of now-existing indebtedness.'" 114 W.Va. at 43, 171 S.E. at 451. This Court held the statute to be unconstitutional. Justice Kenna in his concurring opinion acknowledged the difficult choice that faced the Court in these words:

"I concur in the majority opinion. In doing so, I have a full appreciation of the very serious nature of the difficulty involved and of the far-reaching consequences with which the question is fraught. On the one hand, it is urged that we are faced by the probability of a breakdown of local government in a large number of the taxing units throughout the state through lack of money realized from taxation to provide for their essential functions, and, on the other, that the sovereign will of the people, expressed by them in the very instrument to which these taxing units owe their existence, will be thwarted in a matter of vital importance." 114 W.Va. at 50, 171 S.E. at 544.

I am sure Justice Kenna and the other members of that Court would have been comforted to learn from today's dissent that they could have avoided the entire issue as a "political question."

---

be realized if such property were sold at a forced sale."

**3.** We have in the past utilized statutory provisions as they may bear upon our constitutional language as a guide in interpreting such constitutional language. *E.g., Hendershot v. Hender-*

*shot,* 164 W.Va. 190, 263 S.E.2d 90, 94–95 (1980).

**4.** For a general resume of our cases prior to 1960, *see* Note, *Equality and Uniformity in Property Taxes,* 662 W.Va.L.Rev. 70 (1959).